NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GIBSON PRODUCTS COMPANY OF
WASHINGTON PARISH, LA.,
INC., Respondent.

No. 73–1363.

United States Court of Appeals,
Fifth Circuit.

May 31, 1974.

Elliott Moore, Acting Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., Charles M. Paschal, Jr., Dir., Region 15, National Labor Relations Board, New Orleans, La., Allison W. Brown, Jr., Atty., National Labor Relations Board, Washington, D. C., for petitioner.

David A. Lang, New Orleans, La., for respondent.

Before BROWN, Chief Judge, and RONEY and GEE, Circuit Judges.

RONEY, Circuit Judge:

This is the second petition for enforcement of a National Labor Relations Board bargaining order entered against Gibson Products Company.[1] On the Board's first petition, this Court upheld findings that various activities of Gibson constituted unfair labor practices in violation of section 8(a)(1) of the

National Labor Relations Act, 29 U.S. C.A. § 158(a)(1), and enforced the Board's cease and desist order. The Court remanded the case to the Board, however, for reconsideration of whether an order requiring the Company to bargain with the Union (Local No. 390 of the Retail Clerks International Association) was an appropriate remedy in light of NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and NLRB v. American Cable Systems, Inc., 414 F.2d 661 (5th Cir. 1969) (*American Cable I*), two cases decided after the issuance of the Board's order. NLRB v. Gibson Products Co., 421 F.2d 156 (5th Cir. 1969).

Although on reconsideration the Board adhered to the prescribed remedy of ordering the Company to bargain with the Union on the finding that the facts merited such an order under *Gissel* and *American Cable,* we find an abuse of discretion in ordering such relief in the face of our second holding in *American Cable,* 427 F.2d 446 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L. Ed.2d 266 (1970) (*American Cable II*), and deny enforcement.

## I.

The Supreme Court in *Gissel,* decided almost nine months after the Board's initial decision in this case, made clear that elections are to be preferred over bargaining orders as the means to determine employee sentiment. In laying down guidelines for the issuance of bargaining orders, the Court established three categories of unfair labor labor practices. The first category consists of "exceptional" cases, marked by "outrageous" and "pervasive" unfair labor practices of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." 395 U.S. at 613–614. In a case of this

1. The order now before us, 199 N.L.R.B. No. 115, 81 L.R.R.M. 1499 (1972), reaffirmed the order, 172 N.L.R.B. 2240, 69 L.R.R.M. 1234 (1968), involved in the first enforcement proceeding.

763

character, also known as a *Sinclair* case (after one of *Gissel's* companion cases), a bargaining order may be appropriate without inquiry into union majority status.

The second category is comprised of less extraordinary cases involving less pervasive practices which nevertheless still tend to undermine majority strength and interfere with the electoral process. In such cases a bargaining order could issue if at one point the union had a majority and "[i]f the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight . . . ." *Id.* at 614.

Finally, the Court established "a third category of minor less extensive unfair labor practices, which, because of their minimal impact on the election machinery will not sustain a bargaining order." *Id.* at 615.

In *American Cable II*, this Court, as in this case, had before it a second petition for enforcement after a previous remand for reconsideration of a bargaining order in the light of *Gissel*. Treating the unfair labor practices as a second category case, we held that the Board erred in refusing to consider proffered evidence relating to changes in the situation since the original entry of the Board's bargaining order and held its findings were therefore inadequate. The obvious thrust of this holding was that a bargaining order is beyond the Board's discretion if a fair election could be held at the time of reconsideration of the order on remand.

## II.

In remanding the bargaining order in this case for reconsideration in light of *Gissel* and *American Cable I*, this Court treated the instant case as one within the second *Gissel* category. It is evident that the Board made the same classification initially and that only late in the day did it view the case as governed by *Sinclair*, a first category case which it presumed would sustain a bargaining order on remand even though a fair election could then be held. On August 27, 1970, eight months after the remand, the Board issued a Supplemental Decision and Order, 185 N.L.R.B. 362, 75 L.R.R.M. 1055 (1970), reaffirming the determination that a bargaining order should issue. This opinion contained a paraphrase mixing both the first and second category language of *Gissel*.[2] But the ambiguity as to the Board's classification at that point is clarified by its strong reaction against the decision in *American Cable II*, a second category case. After an extensive review of *Gissel*, the Board concluded that *American Cable II*, in requiring evidence of contemporary conditions to be heard on remand, misconceived *Gissel's* rationale.

The Board took no steps to enforce its reaffirmed bargaining order at that time. A subsequent order entered on April 7, 1971, revealed that a petition for enforcement had been held in abeyance by the Board pending action in the Supreme Court on the Board's petition for certiorari in *American Cable II*. This course of action was adopted because of "the factual similarity" between the two cases. The Supreme Court denied certiorari on December 14,

2. These violations were not in any sense minimal but are such as strike at the very heart of a union's representative capacity with widespread and persistent effects. The coercive effects of Respondent's unlawful acts cannot be eliminated by traditional remedies, and were of a nature as to make a fair election doubtful, if not impossible. Under these circumstances, the purposes of the Act can best be effectuated by reliance on the employees' desires for union representation as expressed by their signed authorization cards rather than on the results of an election conducted in an employer-contaminated atmosphere. Accordingly, we find that the order previously issued to remedy the Respondent's unfair labor practices is appropriate to remedy the violations found, and we shall affirm it.
185 N.L.R.B. at 362, 75 L.R.R.M. at 1055–1056.

1970. 400 U.S. 957, 91 S.Ct. 356, 27 L. Ed.2d 266 (1970). After the Supreme Court permitted *American Cable II* to stand, this factual similarity prompted the Board to reopen the case and remand it for an *American Cable II* hearing on the contemporary necessity for a bargaining order.

After the hearing and post-hearing proceedings, the Trial Examiner (now Administrative Law Judge), who had also presided over the original hearing, issued a Supplemental Decision. He found first, that the Company's unfair labor practices did not have any meaningful contemporary existence, and second, that conditions were sufficiently antiseptic for an election. Before discussing the third aspect of the Board's remand—the appropriateness of a bargaining order—he launched into an extensive criticism of *American Cable II*. The Trial Examiner then advanced for the first time in these proceedings the contention that this is a first rather than a second category case, and has been *ab initio*. He grounded this argument on a sentence in the Board's original decision similar to the finding the Supreme Court deemed sufficient to jus-

tify enforcement without remand of the first category bargaining order in *Sinclair*.[3]

Almost a year later the Board agreed with the new classification, stating in its Second Supplemental Decision and Order

> we find that the instant proceeding falls within the purview of *Sinclair*, and that a bargaining order is the only appropriate remedy for the Respondent's unfair labor practices, regardless of whether lapse of time or other circumstances might now make a fair election possible.

199 N.L.R.B. No. 115, at 5, 81 L.R.R.M. 1499, 1500 (1972) (footnotes omitted). The Board left undisturbed the Trial Examiner's findings that the Company's 1968 violations had no contemporary existence and that the present conditions were sufficiently antiseptic for a free and fair election.

These findings would preclude a bargaining order if the case were still seen as one within the second category. *American Cable II* bars the issuance in a second category case remanded to the Board of an order to bargain, if it ap-

---

3. In the first proceeding, the Board adopted the Trial Examiner's Decision. The relevant language is therefore contained in the latter's opinion.

> In the ordinary case I might not be inclined to regard Sudduth's statements to Jacob, Bates, and Seals, and Douglas' inquiry of Graham as sufficiently damaging to warrant the imposition of a bargaining order as part of the remedy therefor. Compare Hammond & Irving, 154 NLRB 1071, with Wausau Steel Co. v. N.L.R.B., 377 F.2d 369 (C.A.7). But in this case the record establishes that the unlawful acts had a direct impact on the employees. Jacob was temporarily moved to abandon support of the Union, and Seals realized that as a result of the Company's violations "some of them [the employees] were beginning to get upset." Also, after the unlawful threat to withhold favors previously granted, the Company on the next day implemented the threat by stopping the privilege of charging at the pharmacy. In the light of this showing, I would issue a bargaining order to remedy the violations of Section 8(a)(1) by restoring the

> status quo ante, quite apart from the fact that, as noted above, I find the refusal unlawful because the Company had no good-faith doubt of the majority.

172 N.L.R.B. at 2245–2246.

On remand, the Trial Examiner decided the language that a bargaining order should issue "to remedy the violations of Section 8(a)(1) by restoring the *status quo ante*" was a sufficient finding under the first category. He analogized this to the Board's finding in *Sinclair*, referred to by the *Gissel* Court, that the employer's threats of reprisal were so coercive that a bargaining order was required "to repair the unlawful effect of those threats." 395 U.S. at 615. In an earlier portion of his Supplemental Decision, he suggested that our Court had misread the record in the first enforcement proceeding. Our Court, in his view, had ignored the rest of the quoted passage, which allegedly satisfied the second category's requirement of findings that the possibility of ensuring a fair election was slight and that employee sentiment could best be protected by a bargaining order.

pears on remand that contemporary conditions are such that a fair election could be held.

■ It is apparent from the foregoing chronology of this case that the Board, disagreeing with *American Cable II's* requirement of contemporary necessity for a bargaining order in second category cases, has simply sought to avoid it by reclassifying the case from the second to the first category.[4] But *American Cable II* is the law of this Circuit and is as binding on the Trial Examiner and the Board, however great their displeasure with it, as it is on us. It is the law which all must follow until such time as the Court *en banc* overrules the principle[5] or the United States Supreme Court reaches a contrary decision.

### III.

■ Conceding that the bargaining order should not be enforced unless the instant case falls within the first category, the Board now contends that this has been such a case *ab initio*. The difficulty with this characterization is that the Board has never given any findings or reasons as to why traditional remedies could not have cured the coercive effects of the unfair labor practices so that a fair and reliable election could not have been held, the *sine qua non* of a bargaining order in a first category case.[6] The Board is under an obligation to articulate its reasoning and to distinguish factually similar cases with contrary results. NLRB v. Metropolitan Life Insurance Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). Yet the Board has merely stated that a bargaining order was the "only available, effective remedy for substantial unfair labor practices" without any indication why less drastic remedies would not serve to achieve a fair election now or why they

4. Contrary to the fears of the Trial Examiner and the Board, *American Cable II* is not an invitation to wholesale experimentation with delay. It does not require a court reviewing a second category bargaining order to reconsider electoral conditions as of the date enforcement is sought. Nor does it authorize the court to remand a case to the Board merely to update the record on appeal to take into account events subsequent to the Board's action. See J. P. Stevens & Co. v. NLRB, 441 F.2d 514, 525 n. 16 (5th Cir.), cert. denied, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971) ; *American Cable II, supra*, 427 F.2d at 448.

Because we are able to make use of the record developed as a result of an *American Cable* remand of what was perceived as a second category case, it is unnecessary to decide whether an *American Cable II* type remand to determine contemporary necessity would have been required had this case initially been classified in the *Sinclair* category.

5. The Board's Petition for Rehearing En Banc of *American Cable II* was denied after a poll of the Court. *See* 427 F.2d at 449.

6. The Board's findings in the original proceeding are set out in note 3, *supra*. The pertinent language of the Board's Supplemental Decision and Order is quoted in note 2, *supra*.

In its Second Supplemental Opinion and Order the Board's findings were as follows :
Upon reconsideration of the entire case in light of all the standards and guidelines set forth in *Gissel*, we have concluded that we erroneously failed to state in our previous decision in this proceeding that this case is factually and legally governed by *Sinclair*.

. . . we find that the instant proceeding falls within the purview of *Sinclair*, and that a bargaining order is the only appropriate remedy for the Respondent's unfair labor practices, regardless of whether lapse of time or other circumstances might now make a fair election possible. An election here would not remedy the long period during which Respondent's intransigent violations of the Act have denied to its employees the right to bargain collectively. The only remedy in the present circumstances which will effectuate the policy of the Act is a bargaining order. The applicability of this principle here is manifest by the Supreme Court's pronouncement in reaching its *Sinclair* result, that " . . . a bargaining order is designed as much to remedy past election damage as it is to deter future misconduct," and its substantive adoption of the Board's long-standing "policy of issuing a bargaining order, in the absence of a § 8(a) (5) violation or even a bargaining demand, where that was the only available, effective remedy for substantial unfair labor practices."
199 N.L.R.B. No. 115, at 4–6, 81 L.R.R.M. at 1500–1501 (footnotes omitted).

were inadequate for this purpose when the matter was first before the Board.[7] For judicial review to be meaningful more is required of the Board than, in the words of *American Cable II*,

> a litany, reciting conclusions by rote without factual explication. We believe that the questions involved in this area of labor law are far too important for such formalistic and perfunctory treatment. . . . *Gissel* teaches us that . . . all concerned must be particularly careful lest the principles of majoritarianism in union representation be unnecessarily frustrated by the cavalier use of bargaining orders.

427 F.2d at 449. *See* Peerless of America, Inc. v. NLRB, 484 F.2d 1108, 1119 (7th Cir. 1973); General Steel Products, Inc. v. NLRB, 445 F.2d 1350, 1355 (4th Cir. 1971); NLRB v. General Stencils, Inc., 438 F.2d 894, 901 (2d Cir. 1971).[8]

■ Proper findings and conclusions would have explicitly considered traditional remedies such as a cease and desist order, posting or mailing of a remedial Notice to Employees, or other remedies known to the Board, and would have articulated the Board's reasons supporting its conclusion that only a bargaining order would suffice to remedy the unfair labor practices. Perl, The NLRB and Bargaining Orders: Does a New Era Begin with *Gissel?*, 15 Vill.L. Rev. 106, 111–112 (1969). The Board could have given some indication as to the difference between the case at bar and those cases where it found a bargaining order inappropriate even though seemingly similar or perhaps more serious unfair labor practices were involved.[9] *See* Peerless of America, Inc.

---

7. One study of cases remanded for reconsideration in light of *Gissel* suggests that the conclusional nature of the Board's response to the remand in this instance has been the rule rather than the exception.

> [I]n every case [remanded for reconsideration in light of *Gissel*], the Board appears to have merely rephrased its opinion, replacing the Joy Silk [Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951)—the previous legal standard for issuance of a bargaining order] language with *Gissel* language.
>
> In reaffirming the initial bargaining order, the Board would reiterate its former unfair labor practice findings and couch its decision in one or more of the following *Gissel* phrases: Traditional remedies could not ensure a fair rerun; unfair labor practices establish the likelihood of their recurrence; a fair election rerun is unlikely; or the unfair labor practices were so coercive and pervasive as to destroy utterly the conditions necessary for a free election.

Carson, The *Gissel* Doctrine: When a Bargaining Order Will Issue, 41 Fordham L. Rev. 85, 97 (1972) (footnotes omitted).

8. Although the cited cases involved second category rather than *Sinclair* bargaining orders, they are not in this context distinguishable. Both categories require consideration of the effect that traditional remedies would have upon prospects for a fair election. Both categories involve the same underlying determination—the decision to forego an election, the preferred method of ascertaining the will of the majority, in favor of the extraordinary remedy of a bargaining order.

In any event, the requirement of articulated reasons for agency determinations is one that applies across the board of administrative law. *See* 2 K. Davis, Administrative Law Treatise, § 16.12 (1958, 1970 Supp.).

9. Prior to its Second Supplemental Decision and Order in this controversy, the Board had decided against issuance of bargaining orders in a number of apparently similar post-*Gissel* cases. *See*, *e. g.*, Motown Record Corp., 197 N.L.R.B. No. 176, 80 L. R.R.M. 1545 (1972) (conveying impression that employees would be discharged for union activity; suggesting possibility of pay raise; interrogating employees; impressing employees with likelihood that only union defeat could improve working conditions; inviting employees to report on their fellows' union activities); Blade-Tribune Publishing Co., 180 N.L.R.B. 432, 73 L.R.R.M. 1041 (1969) (systematic coercive interrogations; imposition of extremely arduous work schedule on union activist; suggestion of new benefits); Stoutco, Inc., 180 N.L.R.B. 178, 73 L.R.R.M. 1107 (1969) (threats to eliminate existing benefits, impose harsher work conditions, and close plant; promises of benefits; unlawful interrogations; "suggestion" that union activist quit); Schrementi Bros., 179 N.L.R.B. 853, 72 L.R.R.M. 1481 (1969)

v. NLRB, 484 F.2d 1108, 1119 (7th Cir. 1973); NLRB v. General Stencils, Inc., 438 F.2d 894, 905 (2d Cir. 1971), after remand, 472 F.2d 170, 172 (1972).

██ The Trial Examiner, however, suggests the Board's first decision satisfied the findings requirement with the statement that a bargaining order should issue "to remedy the violations of Section 8(a)(1) by restoring the *status quo ante.*" This wording, he submits, was sufficiently equivalent to the finding on which the *Gissel* Court relied in enforcing *Sinclair* that a bargaining order was necessary to repair the unlawful effect of unfair labor practices. *See* 395 U.S. at 615. This suggestion confuses form with substance. The question is not how close the Board came to invoking proper talismanic words or ritual phrases. The purpose of *Gissel* is that the Board, before taking the serious step of issuing a bargaining order, carefully examine the effect of unfair labor practices upon electoral conditions, not merely that it substitute one set of magic words for another. Carson, The *Gissel*

Doctrine: When a Bargaining Order Will Issue, 41 Fordham L.Rev. 85, 113 (1972). Further, since the ultimate inquiry is whether a fair election can be held, the Board must also determine what effect the various traditional remedies at its disposal would have on the disturbed conditions.[10]

## IV.

██ When the Board's reasoning is inadequate, meaningful judicial review is difficult and the normal procedure is to remand. NLRB v. Metropolitan Life Insurance Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); *see* Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). In this case, however, the Board has already had an opportunity to consider *Gissel* on remand. We will assume that it has said all that it has to say concerning this case. In view of the extended time span of this dispute, already in its seventh year, and the simplicity of the factual circumstances involved, we will supply the essential analysis and proceed to

---

(threats and physical assaults on union organizers in presence of employees; threats of loss of existing benefits; informing an employee that employees visited by organizers had been "checked out").

The same situation also prevailed after the Board's decision in this case. *See, e. g.,* Hennessy Service Corp., 204 N.L.R.B. No. 52, 83 L.R.R.M. 1573 (1973) (coercive interrogations; instruction not to discuss the union with other employees; creating impression of surveillance; promises of benefit; solicitation of employees to refrain from election participation; threat that selection of union would be futile); J. J. Newberry Co., 202 N.L.R.B. No. 53, 82 L.R.R.M. 1585 (1973) (interrogating employees; creating impression of, and engaging in, surveillance; discriminatorily refusing to permit an employee to attend employees' meetings); Independent Rapid Trucking, 200 N.L.R.B. No. 58, 82 L.R.R.M. 1169 (1972) (creating impression of, and engaging in surveillance; offer of benefits).

In considering this case, the Board did not mention any of its other adjudications. Appellate counsel, faced with the Company's citation of Board cases, distinguished them as "cases where the Board, in the exercise of its judgment, concluded that the unfair labor

practices committed by the employers were not so flagrant or widespread that a fair election could not be held. Those cases thus fell into the third category of cases . . ."

In the first place, the *post hoc* rationalizations of counsel cannot remedy an agency's deficient reasoning. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); NLRB v. Metropolitan Life Ins. Co., 380 U. S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). Secondly, the suggested distinction is no more than a statement that the cases differed. And that is not enough. "[T]o say that the cases were different, as all cases are, is insufficient, . . . the real question is whether they were significantly different, and, if so, how." NLRB v. General Stencils, Inc., 472 F.2d 170, 174 (2d Cir. 1972) (denying enforcement after *Gissel* remand).

10. The necessity of such findings is not lessened in this case by the fact that *Gissel* was decided after the Board's initial decision. The law prior to *Gissel* authorizing bargaining orders in *Sinclair* situations also required the kind of unfair labor practices having coercive effects that could not be eliminated by application of traditional remedies.

a final disposition, thereby avoiding needless further delay. Peerless of America, Inc. v. NLRB, 484 F.2d 1108, 1120 (7th Cir. 1973); NLRB v. Ship Shape Maintenance Co., 154 U.S.App.D. C. 186, 194 n. 23, 474 F.2d 434, 442 n. 23 (1972); see Harper & Row Publishers, Inc. v. NLRB, 476 F.2d 430, 435–437 (8th Cir. 1973).

█ We turn therefore to the propriety of the bargaining order. As previously noted, Sinclair bargaining orders are justified in exceptional cases marked by unfair labor practices so outrageous and pervasive that traditional remedies cannot eliminate their coercive effects with the result that a free election cannot be held. In his Supplemental Decision, the Trial Examiner found in essence that the cease and desist order removed the electoral taint occasioned by the Company's 8(a)(1) violations. After the Company had been forced by this Court to comply with the order and had posted the required Notice to Employees, a fair election became possible. If traditional remedies such as a cease and desist order and a posted notice can overcome the effect of a pattern of unfair labor practices, that pattern does not meet the definition of a first category case.

█ There is no explanation in the record as to why the taint of the Company's practices would not have been eliminated if the cease and desist order had been promptly complied with when first entered. If prompt compliance would have purged the taint sufficiently to permit a fair election to take place, this has not been a Sinclair case ab initio. The Trial Examiner found in his second opinion that a fair election was not possible at the time of the hearing. But this is true in any case in which the need for a traditional remedy is proved at a hearing. A fair election cannot be held until after the traditional remedies have been enforced. The Company had a right to litigate the propriety of the Board's order. It does not appear that mere delay through maintenance of the litigation, rather than compliance with the cease and desist order, was the operative factor in creating the proper atmosphere. On the record, the Board has not demonstrated that its determination to issue a bargaining order is supported by substantial evidence.

In addition, it seems doubtful that the course of conduct in this case falls within the Sinclair category as envisioned by the Supreme Court. Compare J. P. Stevens & Co. v. NLRB, 441 F.2d 514, 518–522 (5th Cir.), cert. denied, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971) with NLRB v. Kaiser Agricultural Chemicals, 473 F.2d 374, 380–383 (5th Cir. 1973). The Gissel Court did not inadvertently describe first category cases as "exceptional" and the conduct they involve as "outrageous" and "pervasive." The 8(a)(1) violations in this case seem to be common unfair labor practices directed at individuals without evidence of their pervasive effect.[11]

---

11. The Board found seven 8(a)(1) violations.
  1. Douglas (a department manager) asked Graham (an employee he supervised) if she had attended a union meeting and inquired as to what the employees hoped to gain by organizing.
  2. Sudduth (the store manager) asked employee Jacob if she attended any meetings, adding that he knew that two had been held, thereby conveying the impression of surveillance.
  3. In the same conversation, Sudduth also asked Jacob if she could tell him who had attended union meetings.
  4. Toward the end of the conversation, Sudduth stated to Jacob that he intended to "get to the bottom of this" if he had to "question every employee in this store."
  5. Sudduth stated to employees Bates and Seals that he would grant no more special favors, under the circumstances implying a withdrawal of existing benefits and a change in policy in response to union activities.
  6. Hard on the heels of this statement (and the union's claim for recognition), it was announced that employees would no longer be permitted to charge pharmacy purchases, suggesting reprisal for union activities.
  7. West (the company vice-president) stated to employee Seals that he would sign a contract with the employees if they would give up the union.
172 N.L.R.B. 2240, 2245, see 69 L.R.R.M. 1234, 1235 (1968).

## V.

This case is a difficult one. The Board's findings and conclusions leave something to be desired. The law to be applied is somewhat confused. Lurking in the background of the case is the unfair benefit the employer may have obtained through delay, and that one purpose of a bargaining order is to deter future misconduct. *See Gissel, supra,* 395 U.S. at 612. But when the Board issues an order to bargain at a time when employee free choice can be determined by a fair election, the remedy becomes punitive, rather than remedial. Perl, The NLRB and Bargaining Orders: Does a New Era Begin with *Gissel?,* 15 Vill.L.Rev. 106, 118 (1969). Inasmuch as a free election can now be held and the desires of the employees can be fairly determined, we will follow the thrust of *Gissel*: a fair election is the best and preferred method of determining a bargaining representative.

Enforcement denied.