NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DADCO FASHIONS, INC., Respondent.

No. 79–3515.

United States Court of Appeals, Fifth Circuit. Unit A

Dec. 10, 1980.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington D.C., Carol A. De Deo, Penny Pilzer, Washington, D.C., for petitioner.

Kullman, Lang, Inman & Bee, Ernest R. Malone, Jr., Michael S. Mitchell, New Orleans, La., for respondent.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

AINSWORTH, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order requiring Dadco Fashions, Inc., to recognize and bargain with the International Ladies' Garment Workers' Union, AFL–CIO, as representative of the production and maintenance employees at Dadco's two Coushatta, Louisiana, plants. The NLRB found that

Dadco committed several unfair labor practices during a time when the union was seeking to organize the employees. It ordered Dadco to cease and desist from unlawfully interfering with the organization efforts, to post appropriate orders, and to recognize and bargain with the union. In opposition to the Board's petition for enforcement, Dadco raises three issues. The first two issues are relatively minor: whether the Board erred in determining that certain Dadco employees were supervisory, and whether there was sufficient evidence to support the finding of unfair labor practices. The crux of this proceeding lies in the third issue, whether the unfair labor practices warranted a bargaining order. We hold that there was substantial evidence in the record to support the Board's findings and to warrant imposition of a bargaining order, and we therefore grant enforcement.

## I. The Organizational Battle

Dadco Fashions, a manufacturer of children's clothing, employed approximately 90 people in the small town of Coushatta, Louisiana, at the time of the dispute. In August 1976, the International Ladies' Garment Workers' Union began a campaign to organize Dadco's production and maintenance employees. The union held several meetings with employees in late August, and by August 26 had obtained signed authorization cards from a majority of the 82 employees in the bargaining unit.[1] That card majority quickly dissipated, however; by the middle of October, 26 of the 45 employees who had signed cards requested that the union return their cards.

A series of actions attributable to the company allegedly caused this loss of the union's card majority. On August 30, the company's owner, David Dorsky, and its plant manager, Melvin Cauthen, made speeches to the assembled employees. Dorsky complained that the union supporters were trying to "stab him in the back" and had made personal attacks on him. He indicated that he knew what had been said at the meetings, and that he resented the fact that employees even attended the meetings and listened to the union organizers. He also stated that almost all of the plants operated by his family were non-union, and that they had closed other union plants. Cauthen indicated that he too knew what went on at the union meetings. He read the employees a newspaper editorial about a Kentucky labor dispute which portrayed plant closure, economic disaster, and bitter violence as the natural outcome of union organizing. In addition, Cauthen told the employees that there was no reason for additional workers to sign union cards since the union already had enough to force an election, and offered the company's help to those employees who signed cards but were having "second thoughts."

Lower level company officials also acted in opposition to the union's efforts. Supervisors Dorothy Longino and Alta Mae Allen[2] encouraged several employees to attend a lunchtime speech given by employee Randy Tisdale. Tisdale stated that the plant would close if the employees joined the union; Longino and Allen attended the meeting and did not contradict Tisdale. Several supervisors, including Longino, Allen, and Sandra Matthews, let employees know in advance that they would be attending a union meeting held at a local church on August 26; they went to the church that evening, and there is testimony that they attended and made comments at the meeting even though supervisors were explicitly

1. There was some disagreement between the parties as to how many employees were employed in the bargaining unit at the time of the incident and how many valid authorization cards the union obtained. The Administrative Law Judge determined that there were 81 employees in the unit, but the Board included one employee who had been excluded by the judge. Record on Appeal, Vol. 1 at 530, 559. Both the Administrative Law Judge and the Board excluded one of the 46 employees who had signed authorization cards, leaving the union with 45 valid cards for 82 employees. *Id.*

2. The Administrative Law Judge and the Board found Alta Mae Allen and Sandra Matthews to be supervisors, and we affirm that determination later in this opinion. The company concedes that Dorothy Longino was a supervisor.

excluded by the union representatives.[3] On September 2, Longino and others slowly drove back and forth past another union meeting held at a roadside park on September 2. Finally, Longino, Allen, and Matthews questioned at least three employees about their union sentiments and asked them about withdrawing their union authorization cards.

■ The union demanded recognition and bargaining rights on September 16, 1976. After the company refused, the union charged the company with unfair labor practices in violation of Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5).[4] The NLRB General Counsel, after reviewing the matter, issued a complaint on November 11, 1977. The complaint was heard by an Administrative Law Judge in late July 1978; on March 30, 1979, the judge found that the company had coerced its employees, threatened them with plant closure, engaged in surveillance and created the impression of surveillance of union meetings, interrogated employees about their union sentiments, and solicited employees to withdraw their union authorization cards all in violation of Section 8(a)(1). He further found that the unfair labor practices warranted a bargaining order. The Board adopted the Administrative Law Judge's recommended order with only minor modification on August 8, 1979.

## II. The Preliminary Issues

■ The company's first contention is that the Board erred in determining that Alta Mae Allen and Sandra Matthews were supervisors. "The Board's decision on the factual question of . . . supervisorial status is conclusive if supported by substantial evidence." *Sweeney & Co. v. NLRB*, 437 F.2d 1127, 1131 (5th Cir. 1971). We find that substantial evidence supported the Board's finding. The labor act defines supervisor as follows:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The functions of a supervisor listed in the statute are disjunctive; the Board need not show that an employee performed all or several of the functions to support a finding of supervisory status. *NLRB v. Security Guard Service, Inc.*, 384 F.2d 143, 147 (5th Cir. 1967). In the present case, there was considerable evidence before the Administrative Law Judge and the Board that Allen and Matthews did little production work for themselves, but instead told other employees what work to do. The employees were told by the company to obey Allen and Matthews; they performed additional supervisory duties such as monitoring the time cards of late employees, signing production sheets and assigning new work.

■ Appellant next contends that there was not sufficient evidence to support the unfair labor practice findings. This contention depends in part on Dadco's claim that Allen and Matthews were not supervisory and therefore their actions could not be imputed to the company.[5] Since we affirm the Board's finding that Allen and Mat-

---

**3.** There is testimony in the record that Allen admitted just after the meeting that she was a supervisor and that she had been sent to observe the meeting by higher company officials. Longino apparently gave Cauthen a report on the meeting. Record on Appeal, Vol. 1 at 520.

**4.** The Section 8(a)(5) violation is wholly dependent on the Section 8(a)(1) violations; absent unfair labor practices warranting a *Gissel*

bargaining order, the company would clearly have been within its rights to refuse to bargain pending an election even though the union had obtained authorization cards from a majority of the bargaining unit employees. *Linden Lumber Division, Summer & Co. v. NLRB*, 419 U.S. 301, 310, 95 S.Ct. 429, 434, 42 L.Ed.2d 465 (1974).

**5.** *See* Respondent's Brief at 17 and 25.

thews were supervisors, we also affirm its unfair labor practice findings in regard to Allen and Matthews. In addition, Dadco argues that the evidence in regard to the speeches of Dorsky and Cauthen did not support the unfair labor practice findings.[6] The complete texts of the speeches are in the record, and they certainly give the impression that the company conducted surveillance of the union meetings. They may also reasonably be construed to threaten plant closure and to solicit withdrawal of authorization cards. There is thus substantial evidence to support the Board's unfair labor practice findings.

### III. The Bargaining Order

█ The principal issue in this case is whether the unfair labor practices warranted a bargaining order. The company contends that the Board did not take into account the criteria listed in *NLRB v. American Cable Systems, Inc.*, 414 F.2d 661, 668–69 (5th Cir. 1969), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970), for determining whether it should issue a bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and that if it had properly taken those criteria into account it would not have issued the order. In particular, Dadco claims that the Administrative Law Judge and the Board did not consider events subsequent to August 1976 which it contends demonstrate that traditional remedies would suffice to insure a fair election. While we would prefer to see more comprehensive and specific findings, the Board did make at least perfunctory findings on the *American Cable* criteria and the record supports these findings.

In *Gissel,* the Supreme Court decided that the NLRB could issue an order to bargain in situations where an employer committed serious unfair labor practices which tended to undermine a union's majority support if those practices made the holding of a fair election unlikely. 395 U.S. at 610–11, 89 S.Ct. at 1938. The Court noted that under these circumstances a cease–and–desist order and a new election would be an empty remedy since the employer had already undermined the union's strength and destroyed the "laboratory conditions necessary for a fair election . . . ." 395 U.S. at 612, 89 S.Ct. at 1939. Without a bargaining order, the employer would benefit from its own misconduct; it would not only succeed in delaying a fair election, perhaps repeatedly, and delaying the possible onset of unionization, but it would also instill fear in the voting workers. In order to justify such a bargaining order, however, the Board would have to find that a fair election would be unlikely:

> If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election . . . by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue
>
> . . . .

395 U.S. at 614–15, 89 S.Ct. at 1940.

In *American Cable*, this court, interpreting *Gissel* just a month after it was decided, required that the Board make specific findings that the union had a card majority, that the unfair labor practices were "serious and extensive," that traditional remedies would be unlikely to insure a fair election, and that the employees' interests would be best served by a bargaining order. On remand, the Board once again issued a bargaining order. This court again denied enforcement, holding that the Board should have determined whether a bargaining order was needed to insure a fair election at the time of the remand, rather than at the time of the unfair labor practices. *NLRB v. American Cable Systems*, 427 F.2d 446, 448–49 (5th Cir. 1970).[7]

---

**6.** The company apparently does not contest the finding that Longino committed several unfair labor practices; instead it urges that her misconduct was "relatively mild and of brief duration," and did not warrant a bargaining order. Respondent's Brief at 25.

**7.** This court has since held that in a case not involving a remand to the Board, the court

In the present case the Board and the Administrative Law Judge certainly found that the union had a card majority and that the company committed several serious unfair labor practices. As to the need for a bargaining order, the Administrative Law Judge stated:

Based on the foregoing credible evidence, I find and conclude that [Dadco's] unlawful conduct (unfair labor practices), were serious, pervasive, egregious and substantial enough to prevent the holding of a free election. The unfair labor practices in my opinion, warrant the issuance of a bargaining order.

. . . . .

I find that the unfair labor practices engaged in by [Dadco] were serious, pervasive, egregious and substantial enough to undermine the Union and destroy its majority status making the conduct of a free election impossible. Accordingly, under the criteria set forth in *Gissel*, [Dadco] has violated Section 8(a)(5) of the Act and a bargaining order is warranted.

Record on Appeal, Vol. 1 at 530, 532. The Board, in its Decision and Order, considered and rejected the company's contention that the unfair labor practices, in light of the passage of time, did not warrant a bargaining order. The Board noted that "the impact of a respondent's serious and flagrant misconduct remains long after it occurs." Record on Appeal, Vol. 1 at 561.

■ The generality of the Board's findings do not compel us to set aside the bargaining order where, as here, the record substantially supports the Board's conclusions. *Chromalloy Mining and Minerals Alaska Division, Chromalloy American Corp. v. NLRB*, 620 F.2d 1120, 1129–30 (5th Cir. 1980). The record shows the pervasive and egregious nature of the unfair labor practices committed during the 1976 organizational campaign. In a town the size of Coushatta, Louisiana,[8] the knowledge and the threatening effect of the company's actions might certainly have remained from August and September 1976 to July 1978.

Accordingly, enforcement of the order of the Board is hereby

GRANTED.

GEE, Circuit Judge, concurring in part and dissenting in part:

I concur in the judgment of the court except insofar as it enforces the Board's bargaining order. As to that, I would remand for further findings.

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court recognized that bargaining orders could be appropriate remedies in certain *limited* circumstances. In reaching this conclusion, the Court acknowledged that elections were the preferred method of protecting employee free choice. Attuned to these directives, we have refined and applied the lessons of *Gissel* in a number of cases, most notably *NLRB v. American Cable Systems, Inc.*, 414 F.2d 661 (5th Cir. 1969) (*American Cable I*), and *NLRB v. American Cable Systems, Inc.*, 427 F.2d 446 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed. 266 (1970) (*American Cable II*).

In the *American Cable* cases this court required the Board, in its efforts to impose bargaining orders, to make certain specific findings about the difficulty of holding free elections and the need for such a drastic alternative. The court condemned Board efforts to seek enforcement of these orders based on "a litany, reciting conclusions by rote without factual explication." *American Cable II*, 427 F.2d at 449. In *NLRB v. Gibson Products Co.*, 494 F.2d 762, 766–68

should evaluate the appropriateness of the bargaining order as of the date of the unfair labor practice proceedings, not as of the date when the matter comes before the court. *J. P. Stevens & Co. v. NLRB*, 441 F.2d 514, 525 n.16 (5th Cir.), cert. denied, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971); see also *NLRB v. Gibson Prod. Co.*, 494 F.2d 762, 766 n.4 (5th

Cir. 1974). In the present case, we therefore evaluate the bargaining order as of July 1978, the time of the hearing before the Administrative Law Judge.

8. The 1970 Census population of Coushatta was 1,492.

(5th Cir. 1974), the court explained further the specificity requirement, mandating findings such as the express inability of less drastic remedies to "purify" electoral conditions. The findings of the Board here fail the *American Cable* specificity test (indeed, the Board's initial brief to this court does not mention these cases). The Board found the company to have committed serious and pervasive unfair labor practices—the leap from that finding to imposition of the bargaining order is made on no further analysis. This is not much more than the "jejune regurgitation" of the company's past offenses condemned in *American Cable II*, 427 F.2d at 448–49.

In a very recent panel opinion, *Chromalloy American Corp. v. NLRB*, 620 F.2d 1120 (5th Cir. 1980), we dealt with a similar situation. There the Board's findings were similarly vague and unspecific; and Judge Wisdom wrote that "the Board has ignored the specificity requirement." *Id.* at 1129. That deficiency, however, was not fatal. Citing *Gibson Products* for the proposition, the court held that it "may provide the necessary analysis to avoid further delay." *Id.* at 1130 (a somewhat shaky reference, as in *Gibson Products* the case had already been remanded once to the Board for these *American Cable* findings). Relying on the findings made by the Board, the court looked to the severity of the unfair labor practices and the past history of antiunion behavior on management's part to find the likelihood of recurrence to be such as to make the imposition of a bargaining order the necessary remedy. Despite the absence of clear *American Cable* findings, the court enforced the bargaining order because the situation met, in its opinion, the standards set out by the Supreme Court in *Gissel*. *Id.* at 1130–31. The absence of express findings therefore does not, in very extreme cases, call for remand to the Board or preclude enforcement. But considering the overwhelming reliance in *Chromalloy* on the employer's egregious past record and the inability of that or any panel to overrule

*American Cable I* and *II*, one cannot say that *American Cable* findings are no longer required in this circuit.

In *Chromalloy* and in this case the companies argue that substantial employee turnover makes the bargaining orders unfair and inappropriate. Perhaps the Board need not be overwhelmed by such evidence: *Chromalloy* states that the Board need not determine that the actual, present sentiment of the majority of the workers favors unionization before a bargaining order can issue. *Id.* at 1132. Rather, it asserts, the focus should be on the unlikelihood, at the time of the order's issuance, of an election's being an accurate indication of employee sentiment, due to the unfair labor practices of the employer. I think this dubious, but at the least employee turnover between the time of commission of the practices and the hearings before the ALJ remains a relevant factor in evaluating the need for a bargaining order. *See Chromalloy*, 620 F.2d at 1133; *Bandag, Inc. v. NLRB*, 583 F.2d 765, 773 (5th Cir. 1978).

In *Chromalloy* the court found whatever relevance the turnover figures there enjoyed to be outweighed by two other findings: (1) employer recidivism was strongly suggested by the recent past history of union opposition; and (2) the employer was found guilty of a discriminatory refusal to recall an employee, suggesting that the turnover was due at least in part to these antiunion sentiments. 620 F.2d at 1133. Findings of this or of a similar nature are absent from the Board's opinion in this case. The Board's response to Dadco's arguments about employer turnover consists of two sentences, the first a pronouncement of Board power to issue such an order, and the second a reference to a recent Board determination that the impact of grievous misconduct remains long after the particular events. These are not "findings" in this case by the Board but mere assertions: I give them in the margin.[1] As such, they are entitled to no special deference from us.

---

1. It is also well settled that the Board is not precluded from issuing a bargaining order where, as here, there has been a considerable

length of time and a substantial amount of turnover since the commission of the unfair labor practices. In this connection, the Board

The Board's course of decision comes ever closer to "the cavalier use of bargaining orders" condemned in *American Cable II*, 427 F.2d at 449. The *Gissel* remedy is an exceptional one, not the rule: Elections are the preferred method. These are three–party, not two–party, situations; and such actions as the Board has here taken, focussing on penalizing an obstreperous employer, do so at the risk of forcing an unwanted union on employees. Unwilling to bow to the Board's apparent resolve to broaden the *Gissel* exception, ignore our *American Cable* decisions, and impose its view on our circuit, I would remand for proper *American Cable* findings.

recently held with respect to the significance of the passage of time that the impact of a respondent's serious and flagrant misconduct remains long after it occurs.

(footnotes omitted).