**PIGGLY WIGGLY, TUSCALOOSA DIVISION COMMODORES POINT TERMINAL CORPORATION, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 82–7045.

United States Court of Appeals, Eleventh Circuit.

May 31, 1983.

Ernest R. Malone, Jr., Kullman, Lang, Inman & Bee, New Orleans, La., for petitioner, cross-respondent.

John P. Coyle, N.L.R.B., Washington, D.C., for respondent, cross-petitioner.

Before JOHNSON and ANDERSON, Circuit Judges, and COLEMAN *, Senior Circuit Judge.

---

\* Honorable James P. Coleman, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The Board also ordered reinstatement and back pay for an employee named Max Shaw who had been discharged prior to the represen-

---

JOHNSON, Circuit Judge:

Piggly Wiggly, Tuscaloosa Division Commodores Point Terminal Corporation, brings this petition to review and set aside an order of the National Labor Relations Board (the Board) issued on September 30, 1981. The Board found that Piggly Wiggly had committed unfair labor practices prior to a representation election; ordered it, among other things, to cease and desist therefrom; and, under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), ordered it to recognize the Retail Clerks Local 1657, Affiliated with United Food and Commercial Workers, AFL–CIO (the Union), and bargain with the Union in good faith.[1] *Piggly Wiggly, Tuscaloosa Division Commodores Point Terminal Corp.*, 258 NLRB 1081 (1981). Piggly Wiggly raises three issues in this Court: 1) whether the Union timely filed its representation petition and its election objections with the Board; 2) whether the evidence supports the Board's findings as to certain of the alleged unfair labor practices; and 3) whether the issuance of a *Gissel* bargaining order was appropriate in this case. We decide all three issues in favor of the Board and enforce the order.

I. Filing of the Representation ·Petition and Election Objections

 We address first the threshold issue of whether the Union properly followed Board procedures and timely filed its representation petition and its election objections with the Board. In both cases, the Union filed the documents with the Board's Birmingham resident office instead of with the Atlanta Regional Office. The representation petition was filed at the Birmingham office on September 29, 1978, and was received in Atlanta from Birmingham on October 2, 1978. The Board considers only allegations of unfair labor practices within the so-called "critical period," which begins

tation election in violation of § 8(a)(3) and § 8(a)(5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(3), (a)(5). Piggly Wiggly does not appeal from this part of the Board's order.

when a representation petition is filed. *Goodyear Tire and Rubber Co.*, 138 NLRB 453 (1962). Under the Board's regulations, 29 C.F.R. § 102.60(a) (1982), four copies of the petition must be filed with the Regional Director. Relying on § 102.60(a), Piggly Wiggly argues that the proper date of filing for purposes of triggering the "critical period" is the date that the petition is received in the Atlanta office, and that therefore any unfair labor practices occurring before October 2 were not properly before the Board. Similarly, the Union filed its election objections in Birmingham on December 28, 1978, and they were not received in Atlanta from the Birmingham office until January 8, 1979. Piggly Wiggly argues that the election objections were "filed" as of the day they were received in Atlanta. Under Board Regulation § 102.69(a), 29 C.F.R. § 102.69(a) (1982), election objections must be filed within five days of an election,[2] and January 8 was more than five days after the election, which was held on December 20. Thus, the issue before us is the same regarding the filing time of both the representation petition and the election objections: whether to affirm the Board's holding that a filing with the Birmingham resident office constitutes a filing with the Regional Director.[3]

■ The standard of review of the Board's interpretation of its filing regulations is that "[i]t is for the Board to regulate its own procedures and interpret its own rules, so long as it does not act unfairly or in an arbitrary and discriminatory manner." *NLRB v. Martz Chevrolet, Inc.*, 505 F.2d 968, 970 (7th Cir.1974). We conclude,

for three reasons, that the Board did not act unfairly or in an arbitrary and discriminatory manner in deciding that a filing in the resident office constituted a filing with the Regional Director.

First, the nature of the relationship between the Regional Director and his resident officers supports the reasonableness of the Board's interpretation. The Birmingham resident office is under the direct supervision and control of the Atlanta Regional Director. Piggly Wiggly correctly points out that the resident office is not vested with the full authority of the Regional Director, but the resident officer properly acts as an agent of the Director when the resident officer receives papers on behalf of the Director.

Second, the record discloses no evidence that the Board has interpreted the filing requirements inconsistently in the past, and Piggly Wiggly cites no cases in which the Board or any court has held that a filing in a resident office does *not* constitute a filing with the Regional Director. The Board, on the other hand, points to *Henry I. Siegel, Inc.*, 165 NLRB 493 (1967), as a case in which it possibly anticipated its holding in the case before us. In *Henry I. Siegel*, the parties raised the issue of whether a filing with a New Mexico resident office constituted a filing with the Regional Director, who was located in the Albuquerque Regional Office. The trial examiner held that the question of whether a filing in the resident office constituted a filing with the Regional Office was "academic," however, because the filing party had also timely filed directly with the Regional Office.

2. Section 102.69(a) provides in pertinent part: Within 5 days after the tally of ballots has been furnished, any party may file with the regional director an original and three copies of objections to the conduct of the election or conduct affecting the results of the election which shall contain a short statement of the reasons therefor. Such filing must be timely whether or not the challenged ballots are sufficient in number to affect the results of the election.

3. Piggly Wiggly also contends that, even if we affirm the Board's reasoning, we nevertheless should hold that the election objections were

not timely filed because they arrived in the Birmingham office at 3:30 P.M. E.S.T. on December 28. This time, Piggly Wiggly asserts, was after the Atlanta office had closed, and December 28 was the fifth and final day after the election (excluding Christmas and a weekend in the computation of five days). We decline to so hold. When the resident officer acts as an agent of the Regional Director, as we conclude that he did in this case, it is within the sound discretion of the Board to determine the hours and other terms under which the resident officer performs his duties.

Nevertheless, the trial examiner stated in dictum that a filing in the resident office would *not* have constituted a filing with the Regional Office. On appeal to the Board, the Board agreed with the trial examiner that the direct filing with the Regional Office constituted a timely filing. However, the Board expressly refused to adopt the trial examiner's dictum that the filing with the resident office did not constitute a filing with the Regional Office. The District of Columbia Circuit enforced the Board's order and affirmed its decision. *Henry I. Siegel, Inc. v. NLRB,* 417 F.2d 559 (1969), *cert. denied,* 396 U.S. 1015, 90 S.Ct. 556, 24 L.Ed.2d 506 (1970). The Board's refusal in *Henry I. Siegel* to agree with the trial examiner's position on the filing with the resident office—which was the same position that Piggly Wiggly urges us to adopt in this litigation—suggests that the Board has been consistent in its interpretation of the filing requirements. Moreover, *Henry I. Siegel* undermines any claim that Piggly Wiggly might have that it was discriminated against or unfairly surprised by the Board's interpretation of its regulations.

Third, Piggly Wiggly presents no colorable claim of prejudice arising from the delay in the date of receipt of the representation petition and election objections in Atlanta. The supervisors at Piggly Wiggly became aware of the Union activity no later than September 30, and in fact the alleged unfair labor practices began shortly thereafter. Piggly Wiggly contends that it was prejudiced because the Atlanta office certified the election before it received the objections, and then had to decertify it when the objections came in from Birmingham. While this procedure underscores the wisdom of filing directly in regional offices rather than in resident offices, we cannot say in this case that Piggly Wiggly has presented a claim of prejudice sufficient to warrant labelling the Board's action as unfair, arbitrary, or discriminatory. Piggly Wiggly received timely notice of both filings and argued its position fully before the Regional Office, the Administrative Law Judge, and the Board. Moreover, the record discloses no evidence that Piggly Wig-

gly took action during the period between the certification and subsequent decertification that damaged in any way its substantive legal position. Thus, on the facts of this case, we need not decide whether a claim of prejudice arising out of a filing in a resident office could, under certain circumstances, preclude a holding that the date of that filing is controlling. Instead, we hold only that the Board's interpretation under these circumstances was not unfair, arbitrary, or discriminatory.

## II. The Unfair Labor Practices

Following a period of discussion among Piggly Wiggly employees about the possibility of unionizing the Tuscaloosa area stores, a Piggly Wiggly employee on September 27, 1978, contacted the Union and obtained authorization cards. Two days later, when the Union wrote to the Company demanding recognition, at least 101 of the 183 area employees—a clear majority—had signed the authorization cards. As found by the Board, Piggly Wiggly shortly thereafter committed several unfair labor practices in violation of the National Labor Relations Act (the Act), 29 U.S.C.A. § 151 *et seq.:*

> We agree with the Administrative Law Judge's finding that Respondent on September 30, 1978 immediately upon learning of its employees' union activities, coercively interrogated several employees concerning their knowledge of union activities, impliedly promised one employee a wage increase, and created the impression of surveillance, all in violation of Section 8(a)(1) of the Act. We also agree with the Administrative Law Judge's finding that Respondent additionally violated Section 8(a)(1) of the Act on October 1, when 3 of its store managers, 2 assistant store managers, and Vice President Harmon Looney interrupted and interfered with a union meeting attended by more than half of the employees in the 180-person unit by recording employee attendance on computer printout payroll sheets, interrogating employees concerning their reason for attending the meet-

ing, threatening employees with loss of jobs if the Union were selected, promising across-the-board wage increases if the Union were not selected, and threatening employees with store closure if they continued to take the route leading to union representation. Finally, we agree with the Administrative Law Judge's finding that, on October 2, Respondent discharged employee Max Elliot Shaw in violation of Section 8(a)(3) and (1) of the Act.

(footnotes omitted). Piggly Wiggly elects not to contest most of these findings. In fact, our review of the record supports the Administrative Law Judge's conclusion that those which Piggly Wiggly does not challenge—involving the October 1 union meeting—are the most serious of the company's violations. Nevertheless, Piggly Wiggly contests the Administrative Law Judge's findings, which were affirmed by the Board, that Piggly Wiggly management officials engaged in two coercive conversations with employees on September 30.[4] We review the evidence recognizing that as long as the Board's findings were based on a "plausible inference from the evidence," *Sturgis Newport Business Forms, Inc. v. NLRB*, 563 F.2d 1252, 1256 (5th Cir.1977), we will respect the Board's "competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969). In the two conversations at issue, the record reflects that Piggly Wiggly officials made implied threats to withhold planned benefit increases if the Union won the election.[5]

Although such behavior is a clear violation of § 8(a)(1) of the Act, *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964), Piggly Wiggly contends that the discussion of benefits with the employees was permissible because conversations of a similar nature had occurred before the Union activity commenced. While a company may offer its employees better benefits for legitimate, non-anti-union motives, the mere fact that a conversation about benefits occurred before union activity began does not automatically render non-coercive a similar conversation with the same employee after union activity starts. In addition to the implied threats to withhold benefit increases, the Administrative Law Judge found that the employees in the two September 30 conversations received the impression that their union activity was under surveillance, which also is a clear violation of Section 8(a)(1). *NLRB v. Aero Corp.*, 581 F.2d 511, 512–13 (5th Cir.1978). We conclude that the record adequately supports the Board's decision to uphold this finding.[6]

### III. The *Gissel* Order

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court established that the Board has the power to order an employer to bargain with a union when the employer has committed unfair labor practices "that interfere with the election processes and tend to preclude the holding of a fair election." *Id.* at 594, 89 S.Ct. at 1930. When a majority of employees has signed authorization cards designating a union as its bargaining representative, the

---

4. Moreover, we note that these were not the only coercive conversations found by the Administrative Law Judge and the Board.

5. For example, in the first conversation, between Store Manager Jimmy Welborn and employee Terry Braughton, Welborn asked Braughton about the union and told him that, if he ever wanted to talk about the "effect" of unions, Braughton should come by and talk to him. In the second conversation, between Piggly Wiggly Vice President Harmon Looney and employee Joel Robertson, Looney asked about union activity and then reminded Robertson of a conversation they had had previously in

which Looney had discussed the possibility of better benefits that the company "was working on."

6. In the Wellborn-Braughton conversation, Wellborn approached Braughton and asked him about the efforts to organize a union. The record reflects that Braughton denied knowing anything about the union, although two days earlier he had signed a union representation card. In the Looney-Robertson conversation, Looney said to Robertson, "I don't know why you got this started."

Board may issue a *Gissel* bargaining order when the company's unfair labor practices "have [had] the tendency to undermine majority strength and impede the election processes" if "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair return) by the use of traditional remedies, though present, is slight." *Id.* at 614, 89 S.Ct. at 1940. In such circumstances, "[authorization] cards may be the most effective—perhaps the only—way of ensuring employee choice." If the Board did not have the power to issue bargaining orders, "it would in effect be rewarding the employer and allowing him to 'profit from [his] own wrongful refusal to bargain.'" *Id.* at 610, 89 S.Ct. at 1938 (quoting *Franks Brothers Co. v. NLRB,* 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944)).

■ A reviewing court will enforce an order of the Board "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [National Labor Relations] Act." *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). We have long recognized that the Board draws upon an expertise and experience all its own, to which courts accord "special respect." *NLRB v. Kaiser Agricultural Chemicals,* 473 F.2d 374, 382 (5th Cir.1973).[7] Thus, the bargaining order against Piggly Wiggly should not be disturbed "unless it can be shown that the [B]oard either abused its discretion or exceeded its statutory authority." *Id.*[8]

■ We have little difficulty in concluding that "substantial evidence on the record considered as a whole" supports the Board's findings and order, *see Roadway Express, Inc. v. NLRB,* 700 F.2d 687, 692 (11th Cir. 1983), and that the Board did not abuse its discretion or exceed its statutory authority in this case. The record reveals more than adequate support for the finding of the Board that Piggly Wiggly "wasted no time before embarking upon an all-out campaign to defeat the Union," engaging in a "blitz-like attack on the employees [sic] exercise of their Section 7 rights [that] left its mark." ₒThe Board further found that the unfair labor practices "in only 3 days . . . directly involved a major percentage of unit employees" and had the result of "substantially dissipat[ing]" the Union's majority status as it existed on September 29. Thus, when the election was held on December 20, although over two months had passed without an unfair labor practice as found by the Board, the Union lost by a vote of 99 to 60.

■ Piggly Wiggly contends that the Board has in the past refused to issue a *Gissel* order in cases involving more serious violations than occurred here. We conclude, however, that the violations committed by Piggly Wiggly—particularly those occurring at the October 1 meeting—establish more than adequate grounds for a bargaining order when they are considered in light of prior Board precedent. Significantly, it is well established that threats of plant closures, by themselves, can justify a *Gissel* order. *See, e.g., NLRB v. Gissel Packing Co., supra,* 395 U.S. at 587–589, 618–20, 89 S.Ct. at 1926–27, 1942–43 (Court

---

7. The Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, which is binding unless and until overruled or modified by this Court en banc. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

8. Piggly Wiggly relies heavily on the fact that the Administrative Law Judge in this case concluded that a *Gissel* bargaining order was not necessary because certain remedial actions could adequately dissipate the negative effects of the unfair labor practices. Citing cases such as *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 796 97, 71 S.Ct. 456, 469, 95 L.Ed. 456

(1951), Piggly Wiggly argues that a reviewing court should scrutinize the record more carefully when the NLRB reverses a determination of an administrative law judge. The doctrine of *Universal Camera Corp.,* however, should be limited to situations where the Board disagrees with credibility determinations made by the Administrative Law Judge. In this case, the Board adopted all credibility determinations made by the Administrative Law Judge, *see* 258 NLRB at 1081 n. 1, and disagreed only with the interpretation to be given to the facts as he found them.

upheld bargaining order in *Sinclair Co. v. NLRB,* one of three cases consolidated with *Gissel,* where unfair labor practices involved only threats of plant closure); *Chromalloy Mining & Minerals v. NLRB,* 620 F.2d 1120, 1130 (5th Cir.1980). Threats of plant closure are "more effective [in] destroy[ing] election conditions for a longer period of time than other" unfair labor practices. *Gissel, supra,* 395 U.S. at 611 n. 31, 89 S.Ct. at 1938 n. 31. In addition, the obvious surveillance, promises of improved benefits if the employees rejected the Union, coercive interrogations, and the direct impact on a high number of employees (roughly half of the employees attended the October 1 meeting) also support the issuance of a *Gissel* order. *See, e.g., NLRB v. Dadco Fashions, Inc.,* 632 F.2d 493, 497–98 (5th Cir.1980); *NLRB v. WKRG–TV, Inc.,* 470 F.2d 1302, 1319–20 (5th Cir.1973). In light of the seriousness and extent of these violations, and in light of the fact that Piggly Wiggly does not contest the most serious allegations, we are not impressed with its defenses that over two months passed between the violations and the election itself and that one third of the work force turned over between the time of the violations and the time of the hearing before the Administrative Law Judge.[9] In some cases, these factors play a role in determining the contemporary necessity of issuing a bargaining order, particularly if the employees have reason to no longer fear company reprisals and harassment if they vote for the union. *See, e.g., NLRB v. Gibson Products Co.,* 494 F.2d 762 (5th Cir.1974); *NLRB v. American Cable Systems, Inc.,* 414 F.2d 661, 668–69 (5th Cir.1969), *appealed following remand,* 427 F.2d 446 (5th Cir.1970), *cert. denied,* 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). We conclude that this case, however, fits the pattern in which, as the former Fifth Circuit put it, "[p]ractices may live on in the lore of the shop and continue to repress employee sentiment long after most, or even all, original participants have departed." *Bandag, Inc. v. NLRB,* 583 F.2d 765, 772 (5th Cir.1978).[10]

The order of the Board is ENFORCED.

---

**9.** We do not consider Piggly Wiggly's defense that company ownership has changed since the hearing before the Administrative Law Judge because only changes up to the hearing are relevant to the determination of whether a *Gissel* order is appropriate. *Chromalloy Mining & Minerals v. NLRB, supra,* 620 F.2d at 1132.

**10.** In light of our reliance on the October 1 violations as adequate grounds for a *Gissel* order, we need not address the issue, raised by Piggly Wiggly, of whether the discharge of Max Shaw on October 2, *see* note 1 *supra,* further contributed to the undermining of majority support for the Union.