**IMPACT INDUSTRIES, INC.,**
**Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD,**
**Respondent/Cross–Petitioner.**

**and**

**International Union of Automobile, Aerospace and Agricultural Workers of America (UAW), Intervenor.**

**Nos. 87–2377, 87–2634.**

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1988.

Decided May 18, 1988.

Charles Donnelly, N.L.R.B., Washington, D.C., for petitioner/cross-respondent.

Samuel W. Witwer, Jr., Witwer, Moran, Burlage & Witwer, Chicago, Ill., for respondent/cross-petitioner.

Before BAUER, Chief Judge, and CUMMINGS and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Petitioner, Impact Industries, Inc. ("Impact") requests this court to review and set aside an order by the National Labor Relations Board (the "Board") upholding findings that Impact engaged in unfair labor practices and ordering Impact to reinstate certain employees and to bargain with the UAW. The NLRB has cross-petitioned for enforcement of the bargaining order. Although we choose not to disturb the Board's factual findings that Impact committed unfair labor practices in violation of the National Labor Relations Act ("NLRA"), we decline to enforce the Board's bargaining order and remand the case to the Board for further consideration in light of substantial changes occurring in the intervening years affecting both Impact's management and its work force.

A condensed version of the facts are that the UAW began an organizational drive at Impact's plant in Sandwich, Illinois in 1980. As a result of the UAW's efforts, 106 of the 118 plant employees signed valid authorization cards indicating a desire to bargain with the UAW. The UAW then requested that Impact management meet and bargain with the union. Eventually, because Impact refused to bargain on the basis of the authorization cards, the union filed a petition to conduct a representation election in May, 1980.

In the two months before the scheduled election, Impact's management conducted a vigorous anti-union campaign which included threats of a plant closure, threats of discharge, termination of benefits, the institution of new benefits by Impact, and close supervision of union activities.

On May 16, 1980, the union lost the election by a narrow vote of 59 to 49. The union then filed unfair labor practice charges against Impact alleging Impact's anti-union/pro-company campaign violated several provisions of the NLRA.

Even after the charges were filed, Impact continued to violate the NLRA by firing some of the employees who had been instrumental in the union drive. Impact claimed the firings were based on the employees' questionable alien status. These actions resulted in additional charges by the union against Impact.

All the union's charges were eventually heard by an administrative law judge ("ALJ") in February, 1981. On March 25, 1982, nearing a year after the extensive administrative hearing was concluded, the

ALJ determined that Impact had committed a number of egregious unfair labor practices. The ALJ then entered a *Gissel* bargaining order [1] whereby Impact was required to bargain with the union without either a second representation election or a rerun election. The ALJ reasoned that Impact's violations could not be rectified by traditional remedies and that Impact's practices in 1980 had so tainted the work place that a bargaining order was the only viable remedy.

The company appealed to the National Labor Relations Board, challenging both the ALJ's factual findings and the imposition of the bargaining order. The Board, for reasons known only to itself, did not rule on the appeal for nearly five and one-half years. When the Board did issue its decision on July 30, 1987 (amended on September 3, 1987), it modified the ALJ's factual findings only slightly. The Board also enforced the *Gissel* bargaining order but clarified that this was a *Gissel II* order; that is, an order based on less egregious, but nevertheless numerous violations of the NLRA.

During the course of the entire administrative proceeding, Impact attempted to submit additional evidence three times, twice by filing motions with the ALJ, and once on August 21, 1987, by filing a post-decision Motion to Reopen and Reconsider with the Board. In all its motions, Impact pointed out that its work force had experienced almost a 90% turnover and that totally new management (unrelated to the original owners) had taken over. Impact argued that as a consequence of these changes,, which had occurred over the intervening seven and one-half years since the election, the outcome of a second representation election was no longer predictable and a *Gissel* bargaining order was unnecessary.

Both the ALJ and the Board refused to consider Impact's newly submitted evidence. The ALJ found the evidence to be immaterial and on September 30, 1987, the Board denied Impact's motion to reconsider simply refusing to consider the proffered evidence.

■ On appeal, we are constrained to accept the ALJ's factual findings, which include his credibility determinations, and the Board's adoption of those findings unless "exceptional circumstances" warrant a reversal. *NLRB v. Berger Storage & Transfer Co.*, 678 F.2d 679, 687 (7th Cir. 1982). In *Berger* we explained:

> Credibility determinations, including assessments of demeanor, are to be made by the ALJ and the Board ... to the extent that the ALJ's decision rests explicitly on his evaluation of demeanor, the Board and a reviewing court are required to 'weigh those particular findings more heavily.' [*Kopack v. NLRB*, 668 F.2d 946, 954 (7th Cir.1982)]. Moreover, explicit credibility findings are unnecessary when the ALJ implicitly resolves conflicts in testimony as evidence by findings of fact which are supported by the record as a whole. [Citations omitted.]

678 F.2d at 687. Absent evidence that the ALJ exhibited bias, defined as a "complete disregard for sworn testimony, coupled with a tongue in cheek [sic] characterization of those utterances," the court will uphold an ALJ's credibility determinations. *Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 795 (7th Cir.1979). Bias is not established simply by showing the ALJ favored one party's witnesses over the other party's witnesses. *Berger, supra* at 687.

Impact devoted a substantial portion of its appellate brief to the argument that the ALJ's findings (and the Board's adoption of those findings) that it committed numerous unfair labor practices were erroneous. Impact argued that the ALJ's determinations that Impact's actions constituted an attempt to influence the outcome of the election, in violation of the NLRA, were incorrect. Impact's arguments, in large part, are based on its disagreement with the ALJ's resolution of conflicting evidence

---

**1.** In *Gissel Packing Co. v. NLRB*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1968), the Supreme Court first enforced an order by the Board directing an employer to bargain with the union without a further election because of the employer's unfair labor practices.

and on the ALJ's credibility determinations.[2]

▎ Without reviewing here the evidence relating to each alleged unfair labor practice separately, (something which both the ALJ and the Board spent an extensive amount of time in doing), we do not believe Impact has shown "exceptional circumstances" which would require us to reverse the ALJ's factual findings. Impact has not shown the ALJ was biased. The argument that the ALJ made determinations in the union's favor is not sufficient to support the conclusion that the ALJ was biased. Had we been called on to make factual findings in the first instance, we might have resolved some matters differently. Nevertheless, the ALJ's findings are not a distortion of the record nor were they "uttered tongue-in-cheek." The ALJ made a concerted effort in his written decision to describe his credibility determinations. He indicated which facts and witnesses he found persuasive and why. Under these circumstances, we will uphold the ALJ's findings (and the Board's adoption of those findings) that Impact engaged in a number of unfair labor practices.

▎ The real issue then, is whether a *Gissel* bargaining order was the appropriate remedy for Impact's violations. In *NLRB v. Berger, supra,* we said that under the holding in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1968), the Board is empowered to issue a bargaining order in "less extraordinary cases marked by less pervasive practices which, nonetheless, still have the tendency to undermine majority strength and impede the election process." 678 F.2d at 693. This type of *Gissel* order may be appropriate where:

... the Board finds that the possibility of erasing the effects of past practices and of insuring a fair election (or a fair re-

run) by the use of traditional remedies ... is slight....

*Gissel* at 614–15, 89 S.Ct. at 1940. Moreover, in *Gissel,* the Supreme Court ruled that the question of whether to issue a bargaining order is one for the Board, not the courts. *Gissel* at 612 n. 32, 89 S.Ct. at 1939 n. 32.

However, we have also said that in the absence of "an express articulated consideration of the propriety of a bargaining order this court will presume that an election is the preferred means for determining representative status." *Berger,* 678 F.2d at 694. Our holding in *Berger,* was based, in part, on our previous decision in *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108 (7th Cir.1973), in which we required the Board to make:

"Specific findings" as to the immediate and residual impact of unfair labor practices on the election process ... and a "detailed analysis" assessing the possibility of holding a fair election in terms of any continuing effect of misconduct ... and the potential effectiveness of ordinary remedies.

484 F.2d at 1118.

Although the standard enunciated in *Peerless* does not require the Board to articulate its reasons for issuing a bargaining order with "scientific accuracy," the Board must nevertheless delineate the factors it considered important in reaching its decision and the weight to be accorded those factors. *Justak Brothers & Co., Inc. v. NLRB,* 664 F.2d 1074 (7th Cir.1981).

In *Justak,* we acknowledged that once the "Board has spelled out the basis for the issuance of the bargaining order this court's review is limited to whether the Board abused its discretion." 664 F.2d at 1082. An example of where we found that the Board abused its discretion in issuing a bargaining order, is the *Berger* case. In

---

**2.** For example, in attacking the ALJ's determination that Impact instituted certain benefit programs before the election to induce the employees to vote in its favor, Impact argues the ALJ relied on a single witness who said he was unaware of the program and that the ALJ refused to permit the introduction of three Impact exhibits. With regard to the post-election termi-

nation of certain employees based on their questionable alien status, Impact argues the ALJ and the Board "brushed aside" Impact's evidence of past employee screening practices. By asking us to review the ALJ's factual findings, Impact is asking this court to review the evidence and to draw our own conclusions. This we cannot do.

*Berger,* we determined that although the Board discussed the basis for its bargaining order, it "failed to articulate specifically the inadequacy of traditional remedies." 678 F.2d at 695. We therefore remanded the matter to the Board for further consideration of the available remedy.

As in *Berger,* the Board, in this case, articulated its reasons for imposing a *Gissel* bargaining order. The record contains ample evidence and discussion regarding Impact's illegal activities. Even if the Board had not explicitly stated the reasons for issuing a bargaining order in this case, those reasons were discernable from the record. *Justak,* 664 F.2d at 1081 n. 2. The problem in this case is not that the Board failed to articulate a reason for the bargaining order but rather that the Board failed to consider all the relevant evidence concerning the availability of other, more traditional remedies before issuing a broad bargaining order.

The Board, in affirming the ALJ's decision to impose a bargaining order, perfunctorily determined that traditional remedies could not afford the employees relief from Impact's past unfair labor practices. However, the Board refused to consider evidence that there has been an 87% turnover[3] in Impact's work force since the time of the first election in 1980. Thus, the Board, in issuing the bargaining order did not consider that virtually all the employees, present at the time Impact engaged in the illegal activities, were gone. As Impact correctly points out, any taint caused by its past activities would have been substantially disspelled by such a turnover. In addition, Impact attempted unsuccessfully, to present evidence that it is no longer under the same management as it was at the time of the first election. The original co-owners of Impact, in charge at the time of the

first election, have died. Impact attempted to present evidence to the Board that it is presently administered by trustees who are unrelated to the original owners. The only individual related to an original owner and still working at Impact is not involved in Impact's management. For this reason as well, Impact pointed out that it did not appear that the outcome of a second election was preordained and that a bargaining order was necessary. Finally, over seven years passed between the time of the first election and the final decision of the Board. This passage of time, coupled with the change in circumstances at the plant, would seemingly present a strong case in support of Impact's argument that a second representation election should be conducted to permit the new work force at Impact to determine whether it wants to bargain with the UAW.

We are at a loss as to why, after seven and one-half years, the Board refused to consider evidence of substantial changes in the conditions at Impact. This refusal on the part of the Board, is especially puzzling since the evidence Impact attempted to present is particularly relevant in determining whether other, more traditional remedies might be an effective means of rectifying Impact's past sins. If a fair and impartial election can be conducted, a likely event in light of the high turnover in both the work force and management, a bargaining order is unnecessary. To grant a bargaining order in any instance other than in the last resort (when other traditional remedies are available) constitutes an abuse of the Board's discretion. At a minimum, the Board should have considered all the relevant evidence before determining that a bargaining order was warranted. This it failed to do and for that reason we must remand.[4]

**3.** At the time of oral arguments, that percentage had risen to 91%.

**4.** In urging us to enforce its order, the Board has cited *Piggly Wiggly, Tuscaloosa Div., Etc. v. NLRB,* 705 F.2d 1537 (11th Cir.1983), in which the Eleventh Circuit Court of Appeals upheld a *Gissel* bargaining order despite a two month delay and a 33% turnover in the work force. However, in so holding, that court noted:

In some cases these factors [delay and work force turnover] play a role in determining the contemporary necessity of issuing a bargaining order particularly if the employees have reason to no longer fear company reprisals and harassment if they vote for the union. [Citations omitted.]
705 F.2d at 1543. We think this may be such a case. Clearly, the turnover in management and the work force and delay in this case, have a

Because of the changes in circumstances at Impact and the fact that seven and one-half years had elapsed between the first election and the Board's order, we REMAND this matter to the Board for further consideration of the propriety of imposing a bargaining order on Impact.

more serious and far-reaching effect on the propriety of the *Gissel* bargaining order imposed on Impact, than they did in *Piggly Wiggly*.