**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AMERICAN CABLE SYSTEMS, INC., Respondent.**

No. 25358.

United States Court of Appeals Fifth Circuit.

July 18, 1969.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen.

Counsel, Glen M. Bendixsen, Peter Ames Eveleth, Attys., N.L.R.B., Washington, D. C., for petitioner.

Robert Wachs, Bernard Chanin, Philadelphia, Pa., for respondent; Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., of counsel.

Before GOLDBERG and AINSWORTH, Circuit Judges, and SPEARS, District Judge.

GOLDBERG, Circuit Judge:

We once again encounter the question of what an employer may do and must not do when confronted with a union recognition demand based on authorization cards rather than votes. In determining whether the company has transgressed the bounds of the permissible, we must re-examine our prior rulings in his area in the light of the Supreme Court's recent decision in NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L. Ed.2d 547.

In its petition to this Court the National Labor Relations Board seeks enforcement of its order directing the respondent, American Cable Systems, Inc., to recognize and bargain collectively with the Communications Workers of America. The Board found that the company had attemped to discourage union membership by coercive interrogations, promises of benefits, and discriminatory discharges, and that it had thereby violated §§ 8(a) (1) and (3) of the National Labor Relations Act. Reasoning that these unfair labor practices showed that the company's refusal to bargain was not motivated by a "good faith doubt" as to the union's majority status, the Board held that the company had violated its § 8(a) (5) duty to bargain collectively with the representative of its employees. The Board then concluded that these unfair labor practices could best be remedied by a bargaining order.

American Cable admits its guilt with respect to the §§ 8(a) (1) and (3) violations. The company, however, vigorously denies any violation of the § 8(a) (5) duty to bargain and argues that the bargaining order was therefore unwarranted. It asserts that cards essential to the union's majority were fatally tainted because there were misrepresentations in their solicitation and because the solicitor was a supervisor. Postulating that the union did not have a majority of valid authorization cards, the company contends that it did not have a duty to bargain and therefore that it did not violate § 8(a) (5). It further argues that, even assuming a valid card majority, the independent unfair labor practices were not flagrant enough either to warrant the Board's inference that the refusal to bargain was not in "good faith" or to justify the issuance of a bargaining order.

Since the Board's findings with respect to the §§ 8(a) (1) and (3) violations are uncontested, we enforce this part of the Board's order without further ado. We also agree with the Board's determination that the union had a majority of valid authorization cards at the time of its demand for recognition. As to the § 8(a) (5) issue and the propriety of the Board's bargaining order, however, we must, in the light of the new standards announced by the Supreme Court in NLRB v. Gissel Packing Co., *supra*, deny enforcement and remand for further findings.

## I.

American Cable, which is in the CATV (community antenna television) business, operates in the area of Tupelo, Mississippi. At all material times the company had seven employees plus a general manager.

On July 12, 1965, the union wrote to the company, requesting recognition as the exclusive bargaining agent for the company's seven employees. The union stated that it was prepared to prove its majority status by a show of authorization cards and that it wanted to meet and bargain with the company. At this time the union had in its possession signed authorization cards from four of the company's seven employees.

Upon receipt of the union's letter, the general manager summoned two of the card signers and asked whether they

"were part of it." When the two replied that they were, the general manager promptly gave them two weeks notice. Shortly thereafter he interrogated a third employee who saved his job by lying about his union activities.

The general manager then called an attorney, presented him with the foregoing facts, and requested advice. The attorney advised that the discharges were unlawful and should be rescinded immediately. On the basis of this advice and within minutes of the discharges, the discharged employees were reinstated. The general manager told the two employees in the presence of the other interrogated employee that he "had made a mistake, that everything was as it was, and we could continue to work." Thus the company asserts that when shown how it had violated the Act, it "did all it could to cure its original sin."

The difficulty with American Cable's assertion is that the company subsequently backed away from its righteous position and took another bite of the forbidden fruit. On July 16 the union filed a representation petition and, after the customary hearing, an election was scheduled for October 15. Between the time of the union's petition and election day, the company engaged in additional unfair labor practices. The general manager in conversations with at least five employees asked questions about the union's activities and inquired of the questionees what they thought of the union. He then suggested that the employees should form a "company union" promising future benefits to one employee while suggesting to others that, if the union were selected, the company

would withhold benefits that they would otherwise receive.

When the election was held on October 15, the vote was 2–1 against the union. Immediately thereafter, the union filed objections to the election and unfair labor practice charges against the company. Proceedings culminating in this Court were then initiated before the Board.

II.

American Cable's first argument is that it did not violate § 8(a) (5) because the union did not have a majority of valid authorization cards at the time of its demand for recognition and bargaining. The company does not argue that the language on the face of the cards is ambiguous or misleading.[1] Rather, the company contends that the invalidity of the cards arises because (a) they were solicited by a "supervisor" and (b) the solicitor misrepresented the purpose of the cards to the signers. Since the union had only four authorization cards from a bargaining unit of seven employees, the vitiation of one card will destroy the union's majority.

*Solicitations by alleged supervisor.* It is well established that cards solicited by supervisory personnel may not be considered in determining a union's majority status. NLRB v. Hecks, Inc., 4 Cir. 1967, 386 F.2d 317, 322. The rationale for this rule is that a supervisor, through his power over the economic well-being of his charges, is in a position to exert undue and intrinsically coercive influence over their decisions as to whether or not to sign a card. For this rule to apply, however, the record must show either that the solicitor was in fact a supervisor within the contemplation of § 2(11) of the Act,[2] or that the

1. The company does not challenge the Board's finding that "[t]he cards used by the Union in this case clearly state on their face that the signer designates the Union as his 'collective bargaining representative.' In bold letters at the bottom of the face of the card are the words 'REPRESENTATION AUTHORIZATION.' No other purpose for the cards is shown on either the face or the back of the cards." 161 N.L.R.B. No. 28 (1966).

2. Section 2(11) of the National Labor Relations Act defines "supervisor" in the following manner:
"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in

employees solicited had good reason for believing him to be a supervisor and that the circumstances of the solicitation were inherently coercive. *Cf.* Plastic Workers Union Local 18 Intern. Union Doll and Toy Workers, A.F.L.–C.I.O. v. NLRB, 7 Cir. 1966, 369 F.2d 226, 230.

■ The alleged supervisor was a trusted employee who was appointed by the general manager to oversee several projects and to train new employees. He was, however, given no authority to hire, fire, promote, or discharge employees. Nor did he "1) have authority 2) to use independent judgment 3) in performing such supervisory functions 4) in the interest of management." NLRB v. Security Guard Service, Inc., 5 Cir. 1967, 384 F.2d 143, 147. Under these circumstances we find that the record supports the Board's finding that he was not a supervisor within the meaning of the Act. See NLRB v. American Mfg. Co. of Texas, 5 Cir. 1968, 405 F.2d 473. He was no more than a senior employee, leadman, or straw boss. As we said in *Security Guard, supra,* 384 F.2d at 151:

"If any authority over someone else, no matter how insignificant or infrequent, made an employee a supervisor, our industrial composite would be predominately supervisory. Every order-giver is not a supervisor. Even the traffic director tells the president of a company where to park his car."

Moreover, the record does not reflect that the leadman improperly used his position in soliciting cards or that the circumstances of the solicitation warrant any inference of threats or coercion.

*Misrepresentations as to the purpose of the cards.* American Cable asserts that at least one authorization card should be invalidated because it was solicited under the misrepresentation that its *only* purpose was to secure a representation election and because the signer did not really understand the full consequences of his act. Since the record does not support the company's assertion that

the signer was told that the sole, only and singular purpose of the cards was to petition for an election, we turn to the second and more significant prong of the company's misrepresentation argument. American Cable argues that there is not substantial evidence in this record to show that the General Counsel has met his burden of proving that each signer subjectively intended to authorize the union to represent him and that he was aware that he might not be able to resolve any remaining doubts in the protected isolation of the polling booth. In making this argument the company relies primarily upon a line of Fifth Circuit cases holding that the General Counsel, when trying to prove the validity of a card majority, cannot rely on the mere fact that each employee signed an unambiguous authorization card or upon the fact that the signer was not told that the *only* purpose of the card was the securing of an election. This court has repeatedly held that the General Counsel must go further and show that the signer subjectively intended to designate the union to represent him. In Engineers and Fabricators, Inc. v. NLRB, 5 Cir. 1967, 376 F.2d 482, this Court wrote:

"When cards are challenged because of alleged misrepresentations in their procurement, the general counsel must show that the subjective intent to authorize union representation was not vitiated by such representations. Here the Board did not apply this legal standard. Instead it contends that

' * * * documents timely executed which unequivocally authorize a labor organization to act as the collective-bargaining agent of the signers must be treated as valid bargaining authorizations in the absence of a showing of coercion in their procurement or representations that "despite the purpose clearly and expressly stated on the cards themselves the cards would be used only for a different more limited pur-

connection with the foregoing the exercise of such authority is not of a merely

routine or clerical nature, but requires the use of independent judgment."

pose" '. Aero Corp., 149 NLRB No. 114, 57 LRRM at 1490."

"This applies too lax a standard, and therefore the burden was not met. The point is that the Board applied the facts to the wrong legal standard because there was no probing into the subjective intent of the challenged signers."

See also National Labor Relations Board v. J. M. Machinery Corp., 5 Cir. 1959, 410 F.2d 587; NLRB v. Texas Electric Cooperatives, Inc., 5 Cir. 1968, 398 F.2d 722; NLRB v. Southland Paint Co., Inc., 5 Cir. 1968, 394 F.2d 717; NLRB v. Lake Butler Apparel Co., 5 Cir. 1968, 392 F.2d 76.

In holding that the subjective intent of the signer must be probed, this Court rejected the rule laid down by the Board in Cumberland Shoe Corp., 1964, 144 N.L.R.B. 1268, enforced, 6 Cir. 1965, 351 F.2d 917, that there is but one misrepresentation as to the purpose of a card which will vitiate the card: "a statement by the solicitor that the *only* purpose of the card is to obtain an election." NLRB v. Southland Paint Co., supra, 394 F.2d at 726. We reasoned that the card solicitor by using a few carefully chosen words could avoid the Board's mechanical *Cumberland Shoe* rule and still leave the employee with the impression that he was merely petitioning for an election rather than irretrievably designating the union to represent him. Thus the reassuring and somewhat misleading words of the solicitor could easily overshadow and negate the effect of any caveat on the face of the card. In order to prevent any such undermining of employee freedom of choice, we refused to validate cards unless there had been a probe into the signer's intrapsychic processes. In this stand we had the support of the Fourth and Second Circuits. See Crawford Mfg. Co. v. NLRB, 4 Cir. 1967, 386 F.2d 367, cert. denied, 390 U.S. 1028, 88 S.Ct. 1408, 20 L.Ed.2d 286; NLRB v. S. E. Nichols Co., 2 Cir. 1967, 380 F.2d 438. The Board's *Cumberland Shoe* rule, however, was not without support among the Circuits. See, e. g., International UAW of America v. NLRB, 1967, 129 U.S.App.D.C. 196, 392 F.2d 801; NLRB v. Southbridge Sheet Metal Works, 1 Cir. 1967, 380 F.2d 851.

With the Circuits in substantial conflict, the time was ripe for Supreme Court action. In NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 606–608, 89 S.Ct. 1918, 1936, 23 L.Ed.2d 547, the Supreme Court resolved the conflict in favor of the Board's *Cumberland Shoe* rule and against this Court's subjective intent doctrine:

"In resolving the conflict among the circuits in favor of approving the Board's *Cumberland* rule, we think it sufficient to point out that employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. There is nothing inconsistent in handing an employee a card that says the signer authorizes the union to represent him and then telling him that the card will probably be used first to get an election. Elections have been, after all, and will continue to be, held in the vast majority of cases; the union will still have to have the signatures of 30% of the employees when an employer rejects a bargaining demand and insists that the union seek an election. We cannot agree with the employers here that employees as a rule are too unsophisticated to be bound by what they sign unless expressly told that their act of signing represents something else. In addition to approving the use of cards, of course, Congress has expressly authorized reliance on employee signatures alone in other areas of labor relations, even where criminal sanctions hang in the balance, and we should not act hastily in disregarding congressional judgments that employees can be counted on to take responsibility for their acts.

"We agree, however, with the Board's own warnings in Levi Strauss, 172 N.L.R.B. No. 57, 68 L.R.R.M. 1338,

1341, and n. 7 (1968), that in hearing testimony concerning a card challenge, trial examiners should not neglect their obligation to ensure employee free choice by a too easy mechanical application of the *Cumberland* rule. We also accept the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of § 8(a) (1). We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry."

█ In view of the *Gissel* decision, the company's argument concerning the card signers' subjective intent is no longer tenable. We hold that the cards relied on by the union were not so tainted by misrepresentations as to be invalid.[3]

### III.

We now reach the ultimate questions: (a) whether the Board correctly determined that American Cable violated § 8 (a) (5) of the Act by refusing to bargain with the union on the basis of authorization cards; and (b) whether, assuming the violation, the bargaining order issued by the Board was a proper remedy. In answering these questions our guidance comes from the lucid teachings of the Supreme Court in *Gissel* rather than from prior decisions of this Court and the Board.

The full impact of the *Gissel* decision can best be comprehended in the light of the Board's prior practice in refusal to bargain cases, which practice is illustrated by the Board's decision in the case at bar. 161 N.L.R.B. No. 28 (1966). Here the Board first determined that the union had valid authorization cards from a majority of the employees in an appropriate bargaining unit, and then it measured the company's refusal to bargain in the context of the company's conduct after its receipt of the union's demand for recognition. The inquiry was to determine whether the company's refusal to bargain was motivated by a "good faith doubt" as to the union's majority, since under long standing Board policy a refusal to bargain which is not motivated by such "good faith doubt" violates § 8(a) (5). The quest was for the subjective—the company's motivation. The yardstick, however, was objective—what management said and did.

The Board reviewed the list of American Cable's pre-election unfair labor practices and found that these malefactions evidenced the company's "rejection of the collective bargaining principle and its desire to destroy the union's majority status." The refusal to bargain was, therefore, made in bad faith and in violation of § 8(a) (5). The decision to issue a bargaining order followed automatically and without further analysis.

This line of reasoning, which has been upheld by the courts on myriad occasions,[4] is no longer viable. In *Gissel* the Supreme Court, while upholding the validity of bargaining orders where the employer has committed serious independent unfair labor practices, announced: "an employer's good faith doubt is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that inter-

---

3. We note that the Supreme Court in *Gissel* expressly stated that "nothing we say here indicates our approval of the *Cumberland Shoe* rule when applied to ambiguous, dual purpose cards." 89 S. Ct. at 1936. Moreover, the Court stated "[w]e need make no decision as to the conflicting approaches used with regard to dual-purpose cards * * *." 89 S.Ct. at 1937. Thus our earlier decisions regarding ambiguities in the lan-

guage on the faces of cards, e. g., I. T. T. Semi-Conductors, Inc. v. NLRB, 5 Cir. 1968, 395 F.2d 257; NLRB v. Peterson Bros., 5 Cir. 1965, 342 F.2d 221, are still sound.

4. See, e. g., NLRB v. Movie Star, Inc., 5 Cir. 1966, 361 F.2d 346, 351; Joy Silk Mills, Inc. v. NLRB, 1950, 87 U.S.App. D.C. 360, 185 F.2d 732.

fere with the election process and tend to preclude the holding of a fair election." 89 S.Ct. at 1930. In *Gissel* the Supreme Court in effect approved the following approach for determining whether an employer's refusal to bargain is violative of § 8(a) (5) and whether a bargaining order should issue:

> "When confronted by a recognition demand based on possession of cards allegedly signed by a majority of his employees, an employer need not grant recognition immediately, but may, unless he has knowledge independently of the cards that the union has a majority, decline the union's request and insist on an election, either by requesting the union to file an election petition or by filing such a petition himself under § 9(c) (1) (B). If, however, the employer commits independent and substantial unfair labor practices disruptive of election conditions, the Board may withhold the election or set it aside, and issue instead a bargaining order as a remedy for the various violations. A bargaining order will not issue, of course, if the union obtained the cards through misrepresentation or coercion or if the employer's unfair labor practices are unrelated generally to the representation campaign." 89 S.Ct. at 1928.

The precise standard adopted by the Court was articulated as follows:

> "The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that at one point the union

had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehaviour. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards, would, on balance, be better protected by a bargaining order, then such an order should issue (see n. 32, *supra*).

> "We emphasize that under the Board's remedial power there is still a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order. There is, the Board says, no *per se* rule that the commission of any unfair practice will automatically result in a § 8(a) (5) violation and the issuance of an order to bargain. [case cited]." [5]

 Under the *Gissel* holding a bargaining order may issue where: (a) the union had valid authorization cards from a majority of the employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not "outrageous" and "pervasive" enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight"; and (d) employee

---

5. The Supreme Court was careful to emphasize that it was not deciding "whether a bargaining order is ever appropriate in cases where there is not interference with the election process." 89 S.Ct. at 1940. Since in the case *sub judice*, as in the cases before the Supreme Court, the employer's refusal to bargain was accompanied by independent unfair labor practices, we follow in the footsteps of the Supreme Court and express no opinion on that issue.

sentiment can best be protected in the particular case by a bargaining order. In the case *sub judice* the Board did not make findings on all of these points because "its current practice at the time required it to phrase its findings in terms of an employer's good faith doubts * * *." Since it is inappropriate for this Court to make findings on these questions, we remand the case to the Board for appropriate findings.

The part of the Board's order concerning American Cable's violations of §§ 8 (a) (1) and (3) is enforced. As to the Board's bargaining order and the underlying finding of a § 8(a) (5) violation, enforcement is denied and the case is remanded for further findings.