United States Court of Appeals
Fifth Circuit

**F I L E D**

July 1, 2003

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-60030

J. VALLERY ELECTRIC, INC.; VALLERY ELECTRIC, INC.,

Petitioners-Cross-Respondents,

VERSUS

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

Petitions for Review for Enforcement of the
Order of the National Labor Relations Board

Before WIENER, BENAVIDES, and DENNIS, Circuit Judges.

JAMES L. DENNIS, Circuit Judge.

J. Vallery Electric, Inc. and Vallery Electric, Inc. petition for review of the decision and order of the National Labor Relations Board ("Board"). The Board found that the companies are alter egos and/or constitute a single employer and that they violated section 8(a)(1), (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (5), by withdrawing recognition of their employees' collective bargaining representative and by failing to abide by the terms of the collective bargaining

1

agreement.  The Board cross-petitions for enforcement of its order. We DENY the employers' petitions and GRANT enforcement of the Board's order.

I.

Jimmy Vallery ("Vallery") formed Vallery Electric in 1975 as a sole proprietorship offering residential and commercial electrical contracting services in Monroe, Louisiana.  In 1993, he incorporated his business as Vallery Electric, Inc. ("VE").  He and his wife, Bobbie, each owned 50 of VE's 100 shares.  Vallery served as VE's president; his father, A.J. Vallery, was its vice president; and Bobbie Vallery its secretary/treasurer.  Together, the three constituted VE's board of directors.

On September 1, 1992, VE signed a letter of assent authorizing the Quachita Valley chapter of the National Electrical Contractors Association ("NECA"), a trade association, to serve as VE's representative for current and future collective bargaining agreements ("CBA") with the International Brotherhood of Electrical Workers Local 446, AFL-CIO ("IBEW").  In granting this authority to NECA, VE "agree[d] to comply with, and be bound by, all of the terms and conditions contained" in the CBAs negotiated with the IBEW.  VE also

> agree[d] that if a majority of its employees authorize[d] the [IBEW] to represent them in collective bargaining, [VE would] recognize the [IBEW] as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of

2

[the IBEW] on all present and future jobsites.[1]

After VE signed the letter of assent, the IBEW began referring its members to VE for commercial jobs. VE paid these workers according to the union scale. With the knowledge of the IBEW's business manger, Lonnie Shows, however, VE used nonunion labor compensated at nonunion wages for its residential projects. Shows later testified that the long-standing practice among local electrical contractors was to utilize union labor only for commercial jobs.

In July 1995, John Hopkins replaced Shows as the IBEW's business manager. By letter dated October 4, 1995, Hopkins informed local contractors, including VE, that the IBEW and NECA had negotiated a new CBA covering the period of September 1, 1995, through August 31, 1997. Hopkins' letter disavowed any side agreements made by Shows:

> Any verbal or written agreements made by the prior administration with [NECA] or any individual contractors will not be honored by this administration. Only signed agreements by this administration will be honored.

Twice in 1996 Hopkins met with Vallery to complain about VE's use of nonunion labor for residential jobs. On June 18, 1996, VE entered into a voluntary recognition agreement with the IBEW,

---

[1] Section 9(a) of the NLRA provides that "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment." 29 U.S.C. § 159(a).

pursuant to § 9(a) of the NLRA, through which it recognized that the IBEW represented a majority of its employees "in the bargaining unit described in the current collective bargaining agreement" and that the IBEW was "the exclusive collective bargaining agent for all employees within . . . the bargaining unit."

In January 1997, Hopkins complained to NECA that VE was working a commercial job using nonunion employees. Hopkins' complaint prompted a meeting between Hopkins, Vallery, and the president of NECA, at which Vallery agreed to make appropriate payments to the IBEW's apprenticeship fund to resolve the matter. Following the meeting Vallery told the NECA president that he intended "to separate" from VE because of the high cost of union labor. He further said that he had already discussed the matter with a lawyer and was in the process of developing his strategy.

In February 1997, VE transferred title to a warehouse it owned to Jimmy and Bobbie Vallery without compensation. On March 21, 1997, the Vallerys incorporated a new electrical contracting business, J. Vallery Electric, Inc. (JVE), of which they owned all the stock. Jimmy Vallery served as JVE's president; Bobbie Vallery was secretary/treasurer; and Todd Vallery, their son, its vice president. Together, the three formed JVE's board of directors. On the same day that JVE was incorporated, Vallery resigned as president of VE, and he and his wife transferred their VE stock to A.J. Vallery without compensation.

JVE began doing business in May 1997. It operated out of the

4

same facility that VE had used since 1993. It took title to three of VE's five trucks, as well as other pieces of VE's equipment, without compensation. It employed five of VE's seven employees. And it took over VE's residential work, as well as at least one of VE's commercial jobs. Of JVE's first 68 jobs, 55 were residential and 13 were commercial. JVE's yellow-pages advertisement, which closely resembled VE's, announced that JVE performed both commercial and residential work and had been in business since 1965.

VE moved to a new location, where it was run by A.J. Vallery. It performed only commercial work. After several months, it ceased active operations. By January 1998 VE's two remaining employees sought work through the union hall. At the time of the hearing, VE had no jobs and did not employ any electricians.

By letter dated June 9, 1997, Hopkins complained to Vallery that "[VE was] operating a . . . non-union company, known as J. Vallery Electric." He demanded that Vallery "supply [the IBEW] with information concerning VE's relationship with the nonunion company."

On November 18, 1997, the IBEW and NECA reached a new CBA covering the period between September 1, 1997, and August 31, 1999. JVE did not apply the new CBA to any of its employees.

On December 8, 1997, the IBEW charged that VE and JVE were alter egos and/or a single employer and that the company committed unfair labor practices, in violation of § 8(a)(1), (5) of the NLRA,

by failing and refusing to bargain with the exclusive collective bargaining representative of its employees.[2] By letter to the IBEW dated April 9, 1999, Vallery denied that JVE was the alter ego of VE or that the IBEW represented JVE's employees. On April 21, 1999, the IBEW filed a second charge, stating that the company committed unfair labor practices by failing to apply the terms and conditions of the CBA to its employees and by withdrawing recognition of the IBEW as the exclusive bargaining representative of its employees.

The charges were consolidated and a hearing was held. An administrative law judge ("ALJ") issued a decision and recommended order, finding the violations as alleged. On review, the Board adopted the ALJ's findings and recommended order with minor technical modifications.

The Board's order requires JVE/VE to cease and desist from the unfair labor practices found. It requires JVE/VE to apply the terms and conditions of the 1997-1999 CBA and to recognize the IBEW

---

[2] It is an unfair labor practice under § 8(a)(1) of the NLRA for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title," namely to organize, join, and bargain through unions. 29 U.S.C. § 158(a)(1); see also id. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."). It is an unfair labor practice under § 8(a)(5) for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." Id. § 158(a)(5).

as the exclusive collective-bargaining representative of the unit consisting of "[a]ll employees performing electrical work."  It further requires JVE/VE to make its employees whole for any loss of earnings and other benefits suffered as a result of unfair labor practices; to bargain with the IBEW, upon request, and to embody the terms of any understanding that is reached in a written agreement; and to post a remedial notice.

## II.

We will uphold a decision of the Board "if it is reasonable and supported by substantial evidence on the record considered as a whole."[3]  Substantial evidence is "such relevant evidence as a reasonable mind would accept to support a conclusion."[4] "Recognizing the Board's expertise in labor law, we will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case de novo."[5]  Our deference extends to our review of both the Board's findings of fact and its application of the law.[6]  It does not, however, extend to the Board's legal conclusions, including its interpretation of

---

[3] Valmont Indus., Inc. v. NLRB, 244 F.3d 454, 463 (5th Cir. 2001).

[4] Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951), quoted in NLRB v. Thermon Heat Tracing Serv., Inc., 143 F.3d 181, 185 (5th Cir. 1998).

[5] Thermon Heat Tracing, 143 F.3d at 185, quoted in Valmont Indus., 244 F.3d at 463.

[6] 29 U.S.C. § 160(e); Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106 (1942).

7

a collective bargaining agreement, which we review de novo.[7] Still, we are "mindful of the Board's considerable expertise in interpreting collective bargaining agreements."[8]

## III.

The Board made three key determinations in this case. First, it found that VE and JVE are alter egos and/or together constitute a single employer. It then concluded that the appropriate bargaining unit under the 1997-1999 CBA was "All employees performing electrical work." Based on these determinations, it found that JVE/VE had committed unfair labor practices, in violation of § 8(a)(1), (5) of the NLRA, by failing to apply the terms and conditions of the CBA to its employees beginning on March 21, 1997, the day on which JVE was incorporated, and by withdrawing recognition of the IBEW on April 9, 1999, the date of Vallery's letter denying that the IBEW represented JVE's employees.

## A.

An employer cannot evade its obligations to its employees under a CBA "by setting up what appears to be a new company, but is in reality a 'disguised continuance' of the old one."[9] "Although a bona fide successor is not in general bound by a prior collective

---

[7] See Valmont Indus., 244 F.3d at 463; Jones Dairy Farm v. NLRB, 909 F.2d 1021, 1028 (7th Cir. 1990).

[8] Jones Dairy, 909 F.2d at 1028.

[9] Carpenters Local Union No. 1846, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc., 690 F.2d 489, 507 (5th Cir. 1983) (quoting Southport Petroleum, 315 U.S. at 106).

bargaining agreement, an alter ego will be so bound."[10]  Hence, when a successor corporation is merely the alter ego of its predecessor, "the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor."[11]

Whether two companies are alter egos is a question of fact answered through two inquiries.[12]  First, the Board must determine "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership."[13]  Second, it must gauge whether there was an unlawful motive behind the creation of the new business entity, determining whether there was a "disguised continuance" or "attempt to avoid the obligations of [an existing] collective bargaining agreement through a sham transaction or technical change in operations."[14]

We find that there is substantial evidence showing that JVE and VE are identical.  First and foremost, Jimmy and Bobbie Vallery

---

[10] Id. (citing NLRB v. Tricor Prods., Inc., 636 F.2d 266, 269-70 (10th Cir. 1980)).

[11] Howard Johnson v. Detroit Local Joint Executive Bd., 417 U.S. 249, 259 n.5 (1974) (citing Southport Petroleum, 315 U.S. at 106).

[12] See Southport Petroleum, 315 U.S. at 106.

[13] Carpenters Local, 690 F.2d at 507.

[14] Id.

owned both the predecessor and successor corporations.[15] Their transfer of VE to A.J. Vallery, Jimmy's father, without compensation is also indicative of common ownership.[16] There is substantial proof of that JVE and VE had substantially identical business purposes and operations. Both companies offered residential and commercial electrical services. Although JVE focused its business on residential projects, it advertised its commercial services and 13 of its first 68 jobs were commercial.[17] Moreover, JVE took all VE's pending and current residential jobs,

---

[15] Because the alter ego doctrine contemplates the existence of a predecessor corporation and a successor corporation, a single person need not own, manage, or supervise both corporations at the same time. The doctrine would be rendered useless if an employer could avoid liability by simply washing his hands of one company and starting a new one. See Carpenters Local, 690 F.2d at 507-08; see also NLRB v. Omnitest Inspection Servs., Inc., 937 F.2d 112, 113 (3d Cir. 1991) ("When an employer attempts to avoid its labor obligations by pretending to cease operations and then resuming the same operations through another employer, the other employer is held to be the 'alter ego' of the old employer, and is 'subject to all the legal and contractual obligations of the predecessor.'" (citations omitted)).

[16] See NLRB v. Dane County Dairy, 795 F.2d 1313, 1322 (7th Cir. 1986) ("Familial control constitutes common ownership and control."); Goodman Piping Products, Inc. v. NLRB, 741 F.2d 10, 11-12 (2d Cir. 1984) (finding common ownership when the predecessor was corporation wholly owned by the husband and the successor corporation by the wife); J.M. Tanaka Constr., Inc. v. NLRB, 675 F.2d 1029, 1035 (9th Cir. 1982) (finding that ownership of businesses by members of the same family was one indication of alter ego status).

[17] See Advance Elec., Inc. v. IBEW Local No. 124, Int'l Bhd of Elec. Workers, AFL-CIO, 268 NLRB 1001, 1002 (1984) (holding that an employer that performed only residential work and an employer that performed both residential and commercial work had "substantially identical" business purposes and modes of operation).

10

as well as at least one commercial one.  Vallery successively managed VE and JVE and successively supervised the employees of each.  As for equipment, facilities, and employees, JVE took over the building VE had used; took possession of three of VE's five trucks; and became the employer of five of VE's seven employees.[18] JVE even took over the design of VE's advertisement in the local telephone book.  In short, there is substantial evidence that JVE held itself out as a continuation of VE.

We also find that there is substantial evidence of an unlawful motive in the creation of JVE.  VE's transfer of personal and real property, as well as stock, to Vallery or JVE without any consideration shows that there was not even a pretense of an arm's length relationship between JVE, VE, and the principals of each during the formation of JVE.[19]  We flatly reject the argument that JVE was innocently incorporated as a part of A.J. Vallery's estate planning.  Because A.J. Vallery had no ownership interest in VE prior to March 21, 1997, this argument lacks any factual support whatsoever.  On the contrary, the record clearly shows that Vallery openly expressed his concerns about VE's obligations to the IBEW and admitted his intention to start a new corporation specifically

---

[18] See Carpenters Local, 690 F.3d at 508 ("[A]n alter ego case frequently contains specific findings on the substantial continuity of the work force from the union to the nonunion employer.").

[19] See Central States, S.E. & S.W. Areas Pension Fund v. Sloan, 902 F.2d 593, 597 (7th Cir. 1990) (holding that the transfer of ownership of four trucks "without a dollar changing hands" is considered a sham transfer of assets).

11

to avoid paying union wages.[20]

Applying our highly deferential standard of review, we conclude that the Board's adoption of the ALJ's factual finding that JVE was the alter ego of VE is supported by substantial evidence.[21]

### B.

The Board adopted the ALJ's conclusion that the appropriate bargaining unit for the period covered by the 1997-1999 CBA was "[a]ll employees performing electrical work."[22]  JVE/VE argues that the IBEW and the local contractors represented by NECA previously agreed to narrow, and thus to modify, the scope of the bargaining unit to "all . . . employees performing commercial electrical work."

We find no evidence of any intent to modify the bargaining

---

[20] Contrary to VE's and JVE's insistence, neither Vallery's past support of unions nor his intent to make money in forming JVE is relevant to the question of whether JVE was created with an unlawful motive.  See Goodman Piping, 741 F.2d at 12 (explaining that while "anti-union animus may be 'germane,'" it is not necessary "for imposing alter ego status" (citing Tricor, 636 F.2d at 270)); Tricor, 636 F.2d at 269 (holding that the establishment of a successor company for economic gain is "irrelevant" in determining whether the purpose of creating that company was also to avoid labor law obligations).

[21] Because we uphold the Board's alter-ego finding, we need not consider its alternative finding that JVE and VE are a single employer within the meaning of the NLRA.

[22] The conclusion of law reads: "The appropriate unit as described in paragraph 8 of the collective-bargaining agreement for the period from September 1, 1997, to August 31, 1999, as set out in article II, section 3 is as follows: 'All employees performing electrical work.'"

unit description. Indeed, all evidence is to the contrary. The modification JVE/VE says happened was neither memorialized during the pendency of any CBA nor written into any new CBA. It certainly was not expressly made part of the 1997-1999 CBA at issue. Had there been an intent to narrow the unit description at some point, the new description would have appeared in the first CBA after the modification. Indeed, given the importance the IBEW and NECA attached to written documentation (as demonstrated by the CBA provision requiring changes be in writing), it is highly unlikely that they intended to modify the unit description but then failed to memorialize their agreement in subsequent CBAs.

Furthermore, even if at some earlier point the IBEW and NECA had tacitly agreed to narrow the unit description while Shows was the IBEW's business manager, any such modification lasted only as long as the CBA then in effect. In this respect the evidence is unequivocal that, regardless of what had happened previously, there was no agreement to alter the unit description during the pendency of any CBA negotiated by Hopkins. When Hopkins announced the 1995-1997 CBA, for example, he clearly announced his intention to enforce the bargaining unit described in the CBA and expressly disavowed contrary arrangements made by Shows. He reiterated his position to Vallery on more than one occasion during 1996 in the context of complaints that VE was using nonunion workers.

Indeed, VE's own conduct reveals no intent to narrow the unit description beyond what is included in the CBA. In June 1996, VE

13

recognized the IBEW as the representative of its employees "in the bargaining unit described in the current collective bargaining agreement." It made no attempt to qualify its recognition to account for the supposed modification. And in January 1997, VE made a contribution to the IBEW apprenticeship fund to settle a complaint about VE's use of nonunion workers, effectively conceding the scope of the unit description. In short, the evidence in no way indicates any agreement to modify the unit description included in the CBAs at issue or allows a reasonable inference of such an agreement.

We also reject, for two reasons, JVE/VE's alternative argument that the use of nonunion workers for residential jobs became an implied term of the 1997-1999 CBA through the course of past practice. First, as stated above, the evidence shows that the practice did not continue once Hopkins became the IBEW's business manager in July 1995. Hence, at the time the 1997-1999 CBA went into effect in September 1997, there was no on-going past practice of allowing contractors to use nonunion labor on residential jobs.[23]

Second, there is no evidence that the IBEW waived its right to negotiate the scope of the bargaining unit. As a matter of law,

---

[23] For this reason, JVE/VE's reliance on Bonnell/Tredegar Indus., Inc. v. NLRB, 46 F.3d 339, 344 (4th Cir. 1995), is misplaced. In that case the Fourth Circuit held that the company's past practice of calculating an identified holiday benefit pursuant to an unidentified but long-standing formula had become an implied term of the CBA, such that the formula could not be unilaterally altered during the pendency of the CBA. In the present case, there was no on-going past practice that affected the 1997-1999 CBA.

14

the scope of a bargaining unit is a term and condition of employment and, thus, is a mandatory subject of bargaining absent "clear and unmistakable" waiver.[24] To the extent that the IBEW, under Shows's leadership, tacitly agreed to divert residential work away from union labor, such acquiescence does not constitute a waiver of the IBEW's right to bargain the unit description.[25] Accordingly, the unit description was neither modified by agreement nor narrowed through past practice. The unit description is exactly as stated: "all employees performing electrical work."

## C.

The Board found that JVE/VE had committed an unfair labor practice by failing to apply the terms and conditions of the CBA to its employees beginning on March 21, 1997. Because the unit description encompassed both residential and commercial work, and because JVE/VE did not apply the CBA to any employee of JVE, we find that this finding is supported by substantial evidence.

Likewise, the Board's finding that JVE/VE committed an unfair labor practice by withdrawing recognition of the IBEW necessarily follows from Vallery's letter of April 9, 1999. In that letter, Vallery denied that the IBEW represented JVE's employees. Because

---

[24] See Road Sprinkler Fitters Local Union No. 669 v. NLRB, 676 F.2d 826, 831 (D.C. Cir. 1982) (quoting Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 209 (1964)); see also Local 666, Int'l Alliance of Theatrical Stage Employees & Moving Pictures Mach. Operators of the United States & Canada v. NLRB, 904 F.2d 47, 48 (D.C. Cir. 1990) (citing 29 U.S.C. § 158(a)(5), (d)).

[25] Road Sprinkler Fitters, 676 F.2d at 833.

15

JVE and VE are alter egos, Vallery's letter constitutes substantial evidence that JVE/VE withdrew recognition of the IBEW on April 9, 1999.

IV.

For the foregoing reasons, we DENY the petitions for review, and GRANT enforcement of the Board's order.

PETITIONS FOR REVIEW DENIED; ENFORCEMENT GRANTED.