IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 7, 2007

Charles R. Fulbruge III
Clerk

No. 06-60871

CALIFORNIA GAS TRANSPORT, INC.

Petitioner-Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD

Respondent-Cross-Petitioner

Appeal from a Decision of the National Labor Relations Board

Before KING, GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

California Gas Transport, Inc. ("CGT") petitions for review of a decision and order of the National Labor Relations Board ("Board"): (A) concluding that CGT violated §§ 8(a)(1), (a)(3), (a)(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(1), (a)(3), (a)(5), by interrogating employees, promising them pay raises, threatening discharge and other unspecified reprisals, creating the impression of surveillance, soliciting resignations, terminating several employees, giving negative employment references for terminated employees, failing and refusing to bargain with the union, engaging in direct-dealing; and (B) imposing a remedial bargaining order, among other remedies. The Board cross-petitions for enforcement of its order. We AFFIRM the Board's decision and GRANT enforcement of the Board's order.

I

CGT is a Texas corporation that transports propane gas on trucks from locations in Arizona and Texas to distribution facilities in Mexico. CGT is headquartered in El Paso, TX, and has additional operations in Nogales, AZ.[1] At the time of the events giving rise to this action, CGT employed nineteen truck drivers at its Nogales facility and fourteen truck drivers at its El Paso facility. CGT has one customer, Universal Gas & Oil, Ltd. ("Universal"). The truck drivers transport propane gas purchased by Universal to distribution facilities in Mexico operated by Transportadora Silza ("Silza"), a Mexican company. Universal then sells the propane gas to Pemex, a Mexican public utility.

For several years leading up to this case, the CGT truck drivers complained about their wages and working conditions. At various times, drivers from Nogales and drivers from El Paso discussed their common complaints as well as possible ways to address them. The drivers also met with CGT officials on various occasions in the United States and in Mexico to discuss their concerns. In the drivers' views, CGT did not address their concerns.

In August 2004, the Nogales drivers took concerted action in an effort to force CGT to address their concerns. In mid-August, more than a dozen of the Nogales drivers met at a restaurant to discuss their complaints against CGT. Some of the Nogales drivers had been in contact with the El Paso drivers and reported that the El Paso drivers might engage in a work stoppage. The Nogales drivers discussed what to do if CGT asked them to take over the El Paso drivers' routes during the strike. At the conclusion of the meeting, the Nogales drivers decided to contact union organizers for assistance.

The Nogales drivers scheduled a meeting with union organizers from General Teamsters (Excluding Mailers), State of Arizona, Local 104 ("Union").

---

[1] CGT also transports gas from points in California and New Mexico, but these operations are not directly at issue in this case.

Before the meeting, CGT Dispatcher Gabriel Velasco ("Velasco") asked Nogales driver Robert Ryburn ("Ryburn") about the drivers' meeting and their efforts to join the Union. Ryburn feigned ignorance. In Nogales, while the drivers were considering whether to authorize the Union, Velasco further interrogated and threatened several of the drivers and created the impression of surveillance in an effort to dissuade them from authorizing the Union. Nevertheless, the Nogales drivers met with representatives of the Union on August 30, and, by the end of the day, the Union had obtained fifteen signed authorization cards from the nineteen Nogales drivers.

In September 2004, the El Paso drivers took concerted action in an effort to force CGT to address their concerns. Specifically, the El Paso drivers presented CGT with a written petition outlining their requests for improved wages and working conditions. On September 11, after CGT had failed to address their concerns, nine of the El Paso drivers engaged in a work stoppage. The same drivers again refused to work on September 13. The El Paso drivers demanded a meeting, which was held on September 13 at the Silza facility in Juarez, Mexico. During the meeting, CGT Accounting Manager Joel Meraz ("Meraz") rejected many of their requests, explained that some were being considered, and informed the drivers that CGT could not lose another day of transporting gas due to their work stoppage. CGT Operations Manager Oscar Gardea ("Gardea") went further, threatening the drivers with termination and other unspecified reprisals if they continued to complain about wages and working conditions. The drivers asked for time to discuss their options over lunch.

During lunch, an El Paso driver telephoned Nogales driver Rogelio Delgadillo ("Delgadillo") and explained the El Paso drivers' situation. Delgadillo stated that the Nogales drivers had contacted the Union and advised the El Paso drivers to do the same. The Nogales drivers then returned to the Silza facility

and informed Meraz that they would return to work and that they planned to contact the Union. In response, Meraz handed out voluntary resignation letters, which had been prepared for each of the striking drivers. The letters were written in English, even though many of the striking drivers spoke only Spanish. The drivers informed Meraz that they would decide how to respond collectively. After an English-speaking driver translated the letters to his co-workers, they all refused to sign.

The following day, the truckers gathered in an El Paso truck stop, radioed Meraz, and informed him that they were ready to work. Meraz responded that they had been fired on the previous day. The workers did not think they had been fired the previous day. Ultimately, CGT fired all nine drivers who participated in the September 11 and September 13 work stoppages. Shortly after the firing, at the Silza facility in Juarez, Mexico, CGT Business Agent Acosta ("Acosta") had two separate conversations, one with a fired driver and one with a driver who had not been fired because he was on vacation during the work stoppage. During these conversations, Acosta indicated that the nine El Paso drivers were fired because of their collective complaints about wages and working conditions.

Notwithstanding the fact that the Union had obtained authorization cards from fifteen of the nineteen Nogales drivers, CGT circumvented the Union and directly asked the Nogales drivers to take over the striking El Paso drivers' routes during the work stoppage. Velasco informed the drivers that, if they refused, they might be terminated. The Nogales drivers refused. Near the time of their refusal, Delgadillo learned that the striking El Paso drivers had been fired. He heard this from both Velasco and from an El Paso driver.

Shortly after the El Paso work stoppage, the Nogales drivers went public with their union organizing efforts. On September 13, the Union filed a petition seeking to represent the Nogales drivers. CGT received a copy. Thereafter,

Ryburn and Delgadillo openly displayed and distributed Union paraphernalia. On September 24, in Nogales, Gardea fired Ryburn and Delgadillo. Following their termination, Ryburn and Delgadillo inquired about a job with one of CGT's competitors, Coastal Transport ("Coastal"). The job would have required Ryburn and Delgadillo to go to CGT's office regularly to pick up certain customs documents. Gardea provided a negative employment reference for Ryburn and Delgadillo by informing Coastal that CGT did not want Ryburn or Delgadillo at CGT's office. Coastal passed on this message to Ryburn and Delgadillo; they never applied for the position.

The Union election for the Nogales drivers was held on October 18. During the five-week period leading up to the election, Meraz conducted several meetings with groups of Nogales drivers during which he discouraged them from voting for the Union and implied that they would receive a 10% pay increase if the Union lost the election. At the election, four votes were cast for the Union, eight against, and three were challenged. The Union lost. Throughout the events which precipitated this action, CGT never recognized the Union and consistently refused to bargain with it.

The Union filed unfair labor practice charges. After a hearing, an ALJ held that CGT violated Section 8(a)(1) of the NLRA when: Gardea threatened employees with unspecified reprisals; Meraz solicited employees to resign and threatened them with discharge; Acosta threatened employees with discharge; Velasco interrogated and threatened employees and created the impression of surveillance; Meraz implied that employees would receive a wage increase if the Union lost the election; CGT discharged the nine El Paso drivers who had engaged in a work stoppage and mentioned contacting the Union; CGT discharged Ryburn and Delgadillo after they engaged in union and other protected concerted activity; and CGT provided negative employment references about Ryburn and Delgadillo. The ALJ also held that CGT independently

violated Section 8(a)(3) of the NLRA by terminating the nine El Paso drivers, Ryburn, and Delgadillo. Finally, the ALJ held that CGT violated Sections 8(a)(1) and (5) of the NLRA by refusing to recognize and bargain with the Union and engaging in direct-dealing. In light of the Union's original card majority and these unfair labor practices, the ALJ imposed a remedial bargaining order ("Gissel Order"). The Board affirmed the ALJ's conclusions and the imposition of the Gissel Order.[2]

II

We will uphold the Board's decision if it is "'reasonable and supported by substantial evidence on the record considered as a whole.'" J. Vallery Elec., Inc. v. N.L.R.B., 337 F.3d 446, 450 (5th Cir. 2003) (quoting Valmont Indus., Inc. v. N.L.R.B., 244 F.3d 454, 463 (5th Cir. 2001); see also 29 U.S.C. §160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.") In light of the Board's expertise in labor law, "'we will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case de novo.'" Id. (quoting N.L.R.B. v. Thermon Heat Tracing Serv., Inc., 143 F.3d 181, 185 (5th Cir. 1998). Our deference extends to both the Board's "findings of facts and its application of law." Id. (citations omitted). We review the Board's legal conclusions de novo. Id. (citing Valmont, Indus., 244 F.3d at 463).

A

CGT challenges one component of the Board's order: the imposition of a Gissel Order at CGT's Nogales facility.[3] CGT's argument in this regard is

---

[2] Neither CGT nor the Board addressed those conclusions of the ALJ that the Board rejected. Accordingly, we neither describe nor address them.

[3] CGT does not challenge any other component of the Board's order, including the imposition of a cease-and-desist order. Likewise, CGT does not contest the Board's findings

threefold: first, CGT contends that the Board erred in aggregating the NLRA violations at CGT's Nogales and El Paso facilities and at Silza's Juarez facility to justify the Gissel Order; second, CGT contends that any would-be NLRA violation at the Silza facility is outside the purview of the NLRA because the NLRA does not apply extraterritorially; third, CGT argues that the facts do not support a Gissel order and that the Board failed to consider changed circumstances at the Nogales facility in adopting the Gissel Order. Because we find that the NLRA violations at the Nogales facility independently justify imposing the Gissel Order in Nogales, we need not address CGT's first and second arguments. See Moncrief Oil Intern. Inc. v. OAO Gazprom, 481 F.3d 309, 311 (5th Cir. 2007) ("This Court may affirm on any ground supported by the record ... even if it was not reached by the district court.") (citing United States v. Dow Chem. Co., 343 F.3d 325, 330 (5th Cir. 2003); Pub. Citizen, Inc. v. Bomer, 274 F.3d 212, 217 (5th Cir. 2001)).

1

A remedial bargaining order is precisely what its name suggests; it is a remedy that requires an employer to bargain with a union as the exclusive representative of an employee unit, notwithstanding the fact that the unit may not have finally selected the union as its exclusive representative through an

---

that the actions of Gardea, Acosta, Meraz, Velasco, and CGT violated Sections 8(a)(1), (3), and (5) of the NLRA. Accordingly, these arguments are waived. See Askanase v. Fatjo, 130 F.3d 657, 668 (5th Cir. 1997) ("All issues not briefed are waived."); Edwards v. Johnson, 209 F.3d 772, 776 n.1 (5th Cir. 2000) (if petitioner does not assign error to certain findings of the District Court in its initial brief on appeal, then "any challenge to these findings has been abandoned on appeal.") (emphasis added). So too, CGT has waived the catch-all fifth issue in its Statement of Issues, whether the Board's relevant findings are supported by substantial evidence, by failing to brief it. See Justiss Oil Co., Inc. v. Kerr-McGee Refining Corp., 75 F.3d 1057, 1067 (5th Cir. 1996) (holding that a petitioner does not preserve an issue merely by mentioning it in the Statement of Issues section without developing its argument in the body of the brief); United States v. Tomblin, 46 F.3d 1369, 1376 n.13 (5th Cir. 1995) (holding that a petitioner does not preserve an issue by making an assertion in its brief without providing any legal argument that indicates the basis for that assertion) (citations omitted).

election.[4]   A remedial bargaining order is designed "to remedy past election damage [and] defer future misconduct." NLRB v. Gissel Packing Co., 395 U.S. 575, 612 (1969). Accordingly, the Supreme Court has long held that the Board has the authority to issue a bargaining order "where an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined the union's majority. . . ." Gissel, 395 U.S. at 610; see NLRB v. Katz, 369 U.S. 736, 748 (1962). The Board "has the same authority even where it is clear that the union, which once had possession of cards from a majority of employees, represents only a minority when the bargaining order is entered." Gissel, 395 U.S. at 610; see Franks Bros. Co. v. NLRB, 321 U.S. 702, 704-06 (1944).

The Gissel decision thus established two categories of cases in which bargaining orders are justified. Gissel, 395 U.S. at 613-14; see Chromalloy Min. and Minerals Alaska Div., Chromalloy American Corp. v. NLRB, 620 F.2d 1120, 1129 (5th Cir. 1980); NLRB v. Gibson Products Co. of Washington Parish, La., Inc., 494 F.2d 762, 763-64 (5th Cir. 1974). In a Gissel category I case, the Board may enter a remedial bargaining order, even if the union cannot demonstrate that it was supported by a majority of the unit, to remedy "outrageous and pervasive unfair labor practices" if the "coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable [union] election cannot be had." Gissel, 395 U.S. at 613-14 (citations omitted); see Chromalloy, 620 F.2d at 1129; Gibson, 494 F.2d at 763-64. In a Gissel category II case, the Board may enter a remedial bargaining order to remedy "less pervasive [unfair labor] practices which nonetheless still have the tendency

---

[4] The temporary nature of a bargaining order safeguards employees' rights to self-determination; "after the effects of the employer's [union-discouraging] acts have worn off" the employees may "disavow the union ... by filing a representation petition." Gissel, 395 U.S. 575, 613 (1969).

to undermine majority strength and impede the election process" but only if the union once had majority support.    Gissel, 395 U.S. at 614 ; see Chromolloy, 620 F.2d at 629; Gibson, 494 F.2d at 763-64.

The Board found that this is a category II case and entered a Gissel Order for the Nogales facility.  In reaching its decision, the Board considered the cumulative effect of the NLRA violations outlined in Section I, infra.[5]  CGT argues that the Board erred in granting a Gissel Order based on the cumulative effect of these NLRA violations because not all them occurred in Nogales ) ) some occurred in Nogales, others in El Paso, and still others in Juarez.  CGT further contends the Board lacked jurisdiction over the unfair labor practices committed in Mexico.  The Board counters that aggregation was proper and that it had jurisdiction over the unfair labor practices committed in Mexico.[6]  We need not decide these disputes.

Although our review of the record indicates that the cumulative effect of CGT's unfair labor practices likely places this case squarely within category I, we are satisfied that the unfair labor practices committed in Nogales alone justify a Gissel Order under the category II analysis.  See J.P. Stevens & Co., Inc., Gulistan Div. v. NLRB, 441 F.2d 514, 521-22 (5th Cir. 1971) ("[W]e think that the present proceedings constitute one of the exceptional [category I] cases marked by outrageous and pervasive unfair labor practices . . . in any event the bargaining order here was justified [under category II] because the union did at

---

[5] Setting aside its contention that the Board lacks jurisdiction over unfair labor practices committed in Mexico, CGT does not dispute that the NLRA prohibits the unfair labor practices discussed in Section I, infra.

[6] The termination of nine El Paso drivers is the most significant unfair labor practice of those which CGT contends occurred in Mexico.  Specifically, CGT argues that the termination was final when the drivers refused to sign resignation letters provided to them at the Silza facility in Juarez.  The Board, however, found that CGT did not terminate the drivers until the following day in El Paso.  Because we find that the Board's determination is supported by substantial evidence, we cannot disturb the Board's conclusion that these nine workers were, in fact, terminated in El Paso.  See J. Vallery Elec., 337 F.3d at 450.

one point demonstrate a card majority.") (citations omitted). Accordingly, we limit our analysis to the unfair labor practices committed in Nogales under the category II framework.

The Board may issue a remedial bargaining order in a category II case under Gissel if:

> (a) the union had valid authorization cards from a majority of employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not 'outrageous' and 'pervasive' enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) 'the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight'; and (d) employee sentiment can best be protected in the particular case by a bargaining order.

NLRB v. American Cable Sys., Inc., 414 F.2d 661, 668-69 (5th Cir. 1969) (American Cable I) (quoting Gissel, 395 U.S. 614-15). The Board made these findings. We address each in turn and hold that they are supported by substantial evidence.

The first requirement of American Cable I is met. The Board found that fifteen of the nineteen employees in the Nogales facility signed union authorization cards before the failed union election. CGT does not contest this finding on appeal. Nor does CGT contest the validity of the cards or the process by which the Union obtained them. See Bandag, Inc. v. NLRB, 583 F.2d 765, 770-71 (5th Cir. 1978) (noting requirement that union have valid authorization cards from a majority of employees in the appropriate bargaining unit and finding that the first requirement of American Cable I was met without a specific finding as to the validity of the cards) (emphasis added); cf. NLRB v. Roney Plaza Apartments, 597 F.2d 1046, 1051 (5th Cir. 1979) ("We decline to enforce the Gissel order, however, because of the union misrepresentation in securing a card majority.")

The second requirement of American Cable I is also met. In Nogales alone, the Board found that CGT interrogated and threatened employees, created the impression of surveillance, promised benefits if the Union lost, terminated two employees (Ryburn and Delgadillo) who were leading the unionization effort, provided negative employment references for Ryburn and Delgadillo, refused to bargain with the Union, and engaged in direct-dealing. We consistently have held such practices to be sufficiently severe and extensive to satisfy the category II analysis. See Chromalloy, 620 F.2d at 1128-33 (enforcing Gissel Order where employer refused to recall a union-supporting employee for his usual seasonal employment, threatened to close the plant, and promised a benefit to one employee if he opposed the union); Bandag, 583 F.2d at 771-72 (enforcing Gissel Order where employer interrogated employees, threatened to curtail plant expansion or close the plant, terminated an employee who was leading the unionization efforts, and promised a wage increase if the union lost); NLRB v. WKRG-TV, Inc., 470 F.2d 1302, 1321 (5th Cir. 1973) (enforcing Gissel Order where employer interrogated employees, promised benefits if the union lost, prohibited solicitation, and otherwise interfered with unionization efforts). We do so here as well.

The third and fourth requirements of American Cable I are met. In evaluating these requirements, we bear in mind that the close relationship between labor policy and choice of remedy coupled with the Board's expertise in the field of labor relations dictates that we give the Board's opinion "special respect." Gissel, 395 U.S. at 612 & n. 32. That said, the Board evaluated the extensiveness of CGT's unfair labor practices and determined that CGT had engaged in a "calculated and systematic campaign to frustrate and suppress the Section 7 activities of its employees." The Board further found that CGT committed "hallmark" violations of the NLRA, namely beginning an anti-union campaign immediately after learning of unionization efforts and firing the two

11

leaders of the organizing drive. In light of the small size of the unit, the flagrancy of the violations, and the fact that high-level CGT officials supported the anti-union campaign, the Board issued a Gissel Order concluding that traditional remedies were insufficient to negate the coercive impact of the violations on the employees' right to choose whether to be represented. We agree.

2

Although the Board's category II analysis justifies a Gissel Order, we are mindful of the overriding inquiry in determining whether a Gissel Order should issue: whether a fair election could have been held at the time of the Board's decision. In light of this overriding consideration and of CGT's argument that the Board did not consider the effect of changed circumstances in the Nogales facility on a new election, we address the issue of changed circumstances.

CGT argues on appeal that the Board should not have issued a Gissel Order because changed circumstances at the Nogales facility would have permitted a free and fair union election at the time of the Board's decision. In support of this argument, CGT's opening brief fails to provide a single citation of law.[7] Instead, CGT provides a litany of firings and resignations which resulted in ten of the nineteen Nogales drivers leaving CGT, allegedly for reasons unrelated to the anti-union campaign, before the Board's decision. CGT does not explain how these departures would promote a fair election. Nor does CGT elaborate on the present conditions of the plant. To the extent that CGT has made an argument, we find it unpersuasive.

---

[7] Although we make no finding concerning waiver here, at minimum, CGT has come dangerously close to waiving its argument concerning changed circumstances. See Tomblin, 46 F.3d at 1376 n.13 (holding that where a party makes an assertion, "but provides no legal argument in [its] brief that indicates the basis for [its] contention … we do not address it") (citations omitted).

Our decisions require the Board to consider changed circumstances at the Nogales facility, including "passage of time and turnover in the workforce in determining whether a bargaining order was appropriate." NLRB v. U.S.A. Polymer Corp., 272 F.3d 289, 294 (5th Cir. 2001). The Board need not, however, "determine that the actual sentiment of the majority of the work force favors the union" before issuing a bargaining order. Bandag, 583 F.2d at 773. And "of course the order may still be appropriate despite changed conditions . . . ." Polymer, at 294 & n. 1. Indeed, we previously have upheld Gissel Orders notwithstanding changed circumstances. See Chromalloy, 620 F.2d at 1131-33 (upholding Gissel Order despite significant employee turnover); Bandag, 583 F.2d at 771-73 (same).

The Board fulfilled its obligations in this case. The Board considered changed circumstances and found that "the effects of the unlawful conduct are unlikely to be sufficiently dissipated by turnover to ensure a free election." Specifically, the Board found that CGT's calculated and systematic campaign of unfair labor practices would live in the memory of the remaining drivers and likely affect their ability to participate freely in an election. We previously have recognized that the Board's experience and expertise put it in a better position than we to evaluate the seriousness of the unfair practices and their impact on the plant, and that unfair labor practices may "live on in the lore of the shop and continue to repress employee sentiment long after most, or even all, original participants have departed." Bandag, 583 F.2d at 772. CGT provides no cases refuting the Board's analysis. We likewise find none. Accordingly, we cannot say that the Board erred in finding that changed circumstances would not permit a free election.

III

13

In light of the foregoing, we find that the unfair labor practices committed by CGT in its Nogales facility, standing alone, justify the Board's imposition of a Gissel Bargaining Order in Nogales.  Accordingly, we AFFIRM the Board's decision and ENFORCE its Order.

ENFORCED.

KING, Circuit Judge, specially concurring:

I agree with Judge Garza's conclusion that the court should deny CGT's petition for review and enforce the Board's order. As the Board points out, it is entitled to summary enforcement of its unfair labor practice findings directly involving the Nogales drivers because CGT does not specifically challenge any of those findings. As for the Board's findings that CGT committed unfair labor practices against its El Paso-based drivers, CGT's sole defense is that CGT's threats to, and discharges of, the El Paso-based drivers occurred in Mexico. But the Board found that CGT actually discharged the nine El Paso-based drivers in the United States, a finding that is supported by substantial evidence.

The Board's order to CGT to bargain with the Union as the representative of its Nogales drivers is justified not only for the reasons well set out in Judge Garza's opinion but also because the Board was entitled to rely in part on CGT's unfair labor practices against the El Paso drivers. The Nogales drivers were aware that CGT had fired the El Paso strikers because CGT's dispatcher told them that. More important, the fact that CGT unlawfully retaliated against the El Paso drivers when they sought to exercise their Section 7 rights makes it clear that CGT's unlawful response to the Nogales drivers' organizing efforts was standard operating procedure for CGT, not simply an isolated occurrence.

CGT's violations of the Act were, indeed, "hallmark" violations, and the Gissel bargaining order was amply justified.